WESTERN UNION TELEGRAPH COMPANY *v.* THE STATE OF KANSAS EX REL. COLEMAN, ATTORNEY GENERAL.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 4. Argued March, 17, 18, 1909.—Decided January 17, 1910.

A statute of Kansas provided among other things, that before a corporation of another State, even one engaged in interstate business, should have authority to do local business in Kansas, it should pay "to the State Treasurer, for the benefit of the permanent school fund, a charter fee of one-tenth of one per cent of its authorized capital, upon the first $100,000 of its capital stock, or any part thereof; and upon the next four hundred thousand dollars or any part thereof, one-twentieth of one per cent; and for each million or major part thereof over and above the sum of five hundred thousand dollars, $200." The Western Union Telegraph Company, a New York corporation, engaged in commerce among the States and with foreign countries, and seeking to do local business in Kansas, had a capital stock of $100,000,000. The fee demanded of it as a condition of its right to do local business in Kansas, was $20,100. It refused to pay the required fee, and continued, as it had done for many years before to do local or intrastate business in Kansas. Thereupon, the State brought a suit in one of its own courts against the Telegraph Company and sought a decree ousting and restraining the company from doing any local business in Kansas. The state court gave the relief asked. *Held* that:

The right to carry on interstate commerce is not a privilege granted

by the States, but a constitutional right of every citizen of the United States and Congress alone can limit the right of corporations to engage therein. *Crutcher* v. *Kentucky,* 141 U. S. 47.

The power of Congress over interstate commerce is as absolute as it is over foreign commerce.

The rule that a State may exclude foreign corporations from its limits or impose such terms and conditions on their doing business therein as it deems consistent with its public policy does not apply to foreign corporations engaged in interstate commerce; and the requirement that the Telegraph Company pay a given per cent of all its capital, representing all its business, interests and property everywhere, within and outside of the State, operated as a burden and tax on the interstate business of the company in violation of the commerce clause of the Constitution, as well as a tax on its property beyond the limits of the State, which it could not tax consistently with the due process of law enjoined by the Fourteenth Amendment.

Such a requirement imposed a condition on the Telegraph Company forbidden by the Constitution of the United States and violative of the constitutional rights of the company.

The Telegraph Company was no more bound to assent to the condition required of it in order that it might do local business in Kansas, than to a condition requiring it to waive its right to invoke the benefit of the constitutional provision forbidding the denial of the equal protection of the laws or of the provision forbidding the deprivation of property without due process of law.

The disavowal by a State enacting a regulation of intent to burden or regulate interstate commerce cannot conclude the question of fact of whether a burden is actually imposed thereby; and whatever the purpose of a statute it is unconstitutional if, when reasonably interpreted, it does, directly or by necessary operation, burden interstate commerce.

In determining whether a statute does or does not burden interstate commerce the court will look beyond mere form and consider the substance of things.

Consistently with the due process clause of the Fourteenth Amendment a State cannot tax property located or existing permanently beyond its limits.

A court could not give the relief asked by the State without recognizing or giving effect to a condition that was in violation of the Federal Constitution.

75 Kansas, 609, reversed.

THIS action was brought by the State of Kansas in one of its courts against the Western Union Telegraph Company, a New York corporation, to obtain a decree ousting and restraining that corporation from doing, in Kansas, any telegraphic business that was wholly internal to that State, and not pursuant to some arrangement or to meet its contracts with, or obligations to, the Government of the United States. Upon the petition of the Telegraph Company the case was removed to the Circuit Court of the United States for the District of Kansas. But it was thereafter remanded to the state court where, upon a demurrer to the answer, a final decree was rendered prohibiting and enjoining the Telegraph Company from transacting intrastate business in Kansas as a corporation, the decree, however, not to affect the company's duties to or contracts with the United States. From that decree the present writ of error was prosecuted.

The State contends that the decree is in exact conformity with certain provisions of the Kansas statutes to be found in the General Statutes of that State of 1901, Title, Corporations, p. 280, and the General Statutes of 1905, p. 284. Those provisions, or the ones directly involved here, originated in an act known as the Bush Act, passed at a special session of the Legislature in 1898. Laws of Kansas, Special Session, p. 27.

The issues raised by the pleadings arise out of the above statutes. Under those statutes a State Charter Board was organized and its powers defined. That Board was authorized to receive applications from corporations of other States, Territories or countries seeking permission to engage in business as foreign corporations in Kansas. Any such corporation was required in its application to set forth a certified copy of its charter or articles of incorporation, the place where its principal office or place of business was to be located, the full nature and character of the business in which it proposed to engage, the names and addresses of its officers, trustees or directors and stockholders, with a detailed statement of its assets and liabilities, and such other information as the Board might require in

order ·to determine the solvency of· the corporation. The statute further provided that the application should be accompanied by a fee of twenty-five dollars, to be known as an application fee, and that it should be a condition precedent to obtaining authority to transact business in the State that the corporation should file in the office of the Secretary of State its written consent, irrevocable, that actions might be brought against it in the proper court of any county in the State, (in which the cause of action arose, or in which the plaintiff resided), by service of process on the Secretary of State, and stipulating that such service should be valid and binding as if due service had been made upon the president or chief officer of the corporation. Every foreign corporation then doing business in the State was required, within thirty days from the taking effect of the act, to file with the Secretary of State the specified written consent. Gen. Stat. Kansas, 1901, § 1261. If the Charter Board determined that the foreign company seeking to do business in the State was organized in accordance with the laws under which it was created, that its capital was unimpaired, and that it was organized for a purpose for which a domestic corporation might be organized in Kansas, then the Board was directed to grant the application, and by its secretary issue a certificate, setting forth the granting of the application to engage in business in the State, as provided in the statute. *Ib.*, § 1263.

Then come these important sections: "Each corporation which has received authority from the charter board to organize shall, before filing its charter with the secretary of state, as provided by law, pay to the state treasurer of Kansas, *for the benefit of the permanent school fund,* a charter fee *of one-tenth of one per cent. of its authorized capital* upon the first one hundred thousand dollars *of its capital stock, or any part thereof;* and upon the next four hundred thousand dollars, or any part thereof, *one-twentieth of one per cent.;* and for each million or major part thereof over and above the sum of five hundred thousand dollars, *two hundred* dollars. . . . In addition

to the charter fee herein provided, the secretary of state shall collect a fee of two dollars and fifty cents for filing and recording each charter containing not to exceed ten folios, and an additional fee of twenty-five cents for each folio in excess of ten contained in any charter. The fee for filing and recording a charter shall also entitle the corporation to a certified copy of its charter. All the provisions of this act, including the payment of the fees herein provided, shall apply to *foreign* corporations *seeking to do business in this state*, except that, in lieu of their charter, they shall file with the secretary of state a certified copy of their charter, executed by the proper officer of the state, territory or foreign country under whose laws they are incorporated; and any corporation applying for a renewal of its charter shall comply with all the provisions of this act in like manner and to the same extent as is herein provided for the chartering and organizing of new corporations." "Any corporation organized under the laws of another state, territory or foreign country and authorized to do business in this state shall be subject to the same provisions, judicial control, restrictions, and penalties, except as herein provided, as corporations organized under the laws of this state." *Ib.*, §§ 1264, 1267.

By another section it is made the duty of each corporation doing business for profit in Kansas, except banking, insurance and railroad corporations, annually, on or before August 1st, "to prepare and deliver to the secretary of state a complete detailed statement of the condition of such corporation on the 30th day of June next preceding. Such statement shall set forth and exhibit the following, namely: 1st. The authorized capital stock. 2d. The paid-up capital stock. 3d. The par value and the market value per share of said stock. 4th. A complete and detailed statement of the assets and liabilities of the corporation. 5th. A full and complete list of the stockholders, with the postoffice address of each, and the number of shares held and paid for by each. 6th. The names and postoffice addresses of the officers, trustees or directors and mana-

ger elected for the ensuing year, together with a certificate of
the time and manner in which such election was held. . . .
And such failure to file such statement by any corporation
doing business in this state and *not organized under the laws of
this state* shall work a forfeiture of its right or authority to do
business in this state, and the charter board may at any time
declare such forfeiture, and shall forthwith publish such
declaration in the official state paper. . . . No action
shall be maintained or recovery had in any of the courts of
this state by any corporation doing business in this state with-
out first obtaining the certificate of the secretary of state that
statements provided for in this section have been properly
made." Section 1283 (L. 1898, c. 10, § 12, as amended by L.
1901, c. 125, § 3).

Under this statute the Western Union Telegraph Company
made application to the Charter Board for permission to en-
gage in business in Kansas as a foreign corporation stating that
the amount of its capital stock, fully paid up in cash, was one
hundred million dollars. With that application the company
deposited with the Secretary of State the specified fee of
twenty-five dollars, and also its written consent, irrevocable,
in the prescribed form, as to suits brought against it, in the
courts of the State, by service of process on that officer. In
reference to that consent the company, in its answer, said:
"It made such written submission to service and paid such
application fee voluntarily and *ex gratia* and out of a desire to
avoid the appearance of not complying with the reasonable
regulations of the State of Kansas made with reference to its
own corporations; but denies that said payment and that said
written submission were obligatory upon it or were necessary
or essential as a condition precedent to its continuing to trans-
act business within the State of Kansas, both state and inter-
state."

The Charter Board granted the application of the Telegraph
Company, but its order to that effect, made April 5th, 1905,
recited that the application be granted and the applicant au-

thorized and empowered to transact the business of receiving
and transmitting messages by telegraph within the State of
Kansas and transacting within the said State its business of a
telegraph company, provided that the order should not take
effect and no certificate of authority should issue or be de-
livered to the company "*until* such applicant shall have paid
to the State Treasurer of Kansas, *for the benefit of the permanent
school fund,* the sum of twenty thousand one hundred dollars
($20,100), *being the charter fee provided by law necessary to be
paid by a foreign corporation having a capital of* $100,000,000.
It is further understood, ordered and provided that nothing
herein contained shall apply to nor be construed as restricting
in any wise the transaction by the said applicant of its inter-
state business nor its business for the Federal Government;
but that this grant of authority and requirement as to pay-
ment relate only to the business transacted wholly within the
State of Kansas." The above fee of $20,100 was the specified
per cent. *of* the *authorized capital* of the company which the
statute required it to pay before doing or continuing to do any
local business in Kansas.

The company refused to pay the fee thus required, and con-
tinued, as before, to do telegraph business of all kinds in Kan-
sas. Thereupon the present action was brought, the sole
ground of complaint being that in consequence of the failure
of the Telegraph Company to pay the charter fee of $20,100 it
was without authority to continue doing any *intra*state or local
business in Kansas. The relief sought by the State, as shown
by the prayer of its petition, was that the defendant be re-
quired to show by what authority it exercised within Kansas
the corporate right and power of receiving, transmitting and
delivering telegraphic messages within its limits and receiving
compensation therefor; that it be adjudged by the court that
the defendant had no authority of law for the performance of
such corporate acts and the exercise of such corporate powers
and franchises and the carrying on of said corporate business
within the State; and that it be decreed and adjudged that the

defendant "be ousted of and from exercise within the State of Kansas of the said corporate rights and franchises of receiving, transmitting and delivering within the State of Kansas of telegraphic messages and communications and of receiving compensation therefor."

The reasons given by the Telegraph Company for its refusal to pay the required fee are set forth in its answer, to which a demurrer was sustained, and may be summarized as follows: 1. That the company had the right to transact both interstate and local business in Kansas without paying the fee of $20,100. 2. That by the laws of Kansas, enacted while it was a Territory and after it became a State, telegraph companies were invited to come into it and do both domestic and interstate business there, and in consequence of such invitation the company had established between eight hundred and nine hundred offices in Kansas at great expense, all of which was done in the full faith that it would receive the equal protection of the laws under the Constitution of the United States. 3. That it had been doing a general telegraph business in Kansas ever since its organization as a Territory. 4. That on the seventh day of June, 1867, it duly accepted the conditions of the act of Congress of July 24th, 1866, c. 230, 14 Stat. 221, entitled "An act to aid in the construction of telegraph lines, and to secure to the Government the use of the same for postal, military, and other purposes" (Rev. Stat., §§ 5263 *et seq.*), whereby it became and is now an instrument of interstate commerce and an agency of the United States for the transaction of public business, and subject to all the duties imposed and entitled to all the rights, benefits and privileges conferred by said act of Congress. 5. That its lines were originally constructed in the Territory of Kansas by the authority of an arrangement made with the Secretary of the Treasury in conformity with certain acts of Congress, one of which was enacted June 16th, 1860, c. 137, 12 Stat. 41, and was entitled "An act to facilitate commerce between the Atlantic and Pacific States by electric telegraph," the other, enacted July 2d, 1864, c. 220, 13 Stat. 373, entitled

"An act for increased facilities of telegraphic communication between the Atlantic and Pacific States and the Territory of Idaho;" and the Telegraph Company, therefore, "has always been in the State of Kansas rightfully for the purpose of the transaction of governmental business and for the public generally, and that it cannot be now excluded therefrom." 6. That the company's lines of telegraph within Kansas are upon the public domain and upon military and post roads of the United States and are part of the postal system of the United States, and that the defendant has, therefore, under the Constitution and laws of the United States, the power and is under the duty and obligation to transmit all messages for the Government and for the public generally just as much and as fully with respect to messages between points within Kansas as to interstate messages. 7. That the enforcement of the statute of Kansas would seriously affect and cripple the company's efficiency as an instrument of interstate commerce and as an agency of the Government for transacting both interstate and domestic business in that State, because the receipts derived from interstate and governmental business alone would, in many offices in Kansas, not be equal to the expense of keeping such offices open, and that the closing of them on that account would be detrimental to the governmental service, as well as to interstate commerce. 8. That by the statutes in question "any corporation, including telegraph companies, organized in the State, is authorized to do business in Kansas upon paying a charter fee based on the actual capital of such corporation *employed in the State of Kansas,* whereas, in respect to the defendant company, the Charter Board requires, and is attempting to exact from the defendant company, by this proceeding, a charter fee based upon the defendant's *entire capitalization,* to wit, one hundred million dollars, which one hundred million dollars *represents the property and lines of telegraph of the defendant company in the forty-five States of the American Union, in the Dominion of Canada, and lines under the Atlantic and Pacific Oceans and in foreign countries."* 9. That such tax is

upon property and rights outside of Kansas and, therefore, *beyond its jurisdiction for purposes of taxation.* 10. That "by laws passed relating to private corporations, and especially by laws having reference to telegraph companies, some enacted by the Legislature of the Territory of Kansas and many since the creation and organization of the State of Kansas, telegraph companies, including the Western Union, were invited to come into the State of Kansas and build and construct their lines therein and to connect said lines with other telegraph lines then or thereafter constructed, and to do a general telegraph business, both domestic and interstate, throughout the State of Kansas and to thereby place the citizens of the State of Kansas, wherever the lines reached, in direct telegraphic communication with all parts of the United States; that said telegraph companies, including the Western Union Telegraph Company, were by the laws of the State of Kansas authorized to go upon the public highways of the State and thereon place their poles and wires; that in pursuance of such invitation and before the admission of the State of Kansas to the Union the Western Union Telegraph Company entered the State of Kansas and extended its lines to all points where the same might be needed, and subsequent to the admission of the State, by construction and purchase, lines of the Western Union Telegraph Company were extended to all parts of the State of Kansas and between eight hundred and nine hundred offices established for the use and convenience of the public; that there had been expended by the defendant at the time of the enactment of the so-called Bush Corporation Act, under which the present proceeding is brought, many thousands of dollars in the construction of lines and wires and in the other appurtenances of the telegraphic business and in the establishment of offices; that all of this money was expended in full faith and confidence in the laws already enacted by the State of Kansas for the furtherance and encouragement of telegraphic business, and also in the full faith that said company would have the equal protection of the laws of the State of Kansas, and the fair,

equitable and equal treatment required by the Constitution of the State of Kansas in the matter of taxes and other public charges imposed upon it." 11. That the statute in question, so far as it prevents the company from using its property in the State, for all purposes of its business, would operate as a taking of such property without due process of law. 12. That the statute is in contravention of the power of Congress to regulate commerce among the several States, and with foreign countries, with its power to establish post-offices and post roads, and with its authority to pass all laws necessary and proper to carry into execution the powers vested in the Government of the United States.

*Mr. Rush Taggart* and *Mr. Henry D. Estabrook*, with whom *Mr. John F. Dillon*, *Mr. George H. Fearons* and *Mr. Charles Blood Smith* were on the brief, for plaintiff in error:

The Bush Act violates the contract under which the Telegraph Company entered Kansas, constructed its lines and maintained its business in that State and the tax amounts to taking its property without due process of law.

The purpose of the act is to compel a foreign corporation, as a condition precedent to continuing to do business, to pay. an additional fee after the State has invited it to come within its limits and construct its plant. This cannot be done. *American Smelting Co.* v. *Colorado*, 204 U. S. 103.

The State compels all telegraph companies to maintain offices in all county towns. The act is practically a confiscation of property. 3 Clark & Marshall on Corp., § 845; *United States* v. *Cruikshank*, 92 U. S. 542, 555; *Seaboard Air Line* v. *Alabama R. R. Comm.*, 155 Fed. Rep. 792, 802; *Railway Co.* v. *Ludwig*, 156 Fed. Rep. 152, 159; *People* v. *Fire Association*, 92 N. Y. 311, 325; *S. C.*, aff'd 119 U. S. 110.

As to the rights of the Telegraph Company in Kansas see *United States* v. *Central Pacific R. R.*, 118 U. S. 235; *St. Louis* v. *Western Union Tel. Co.*, 148 U. S. 103; *New Orleans* v. *Telephone Co.*, 40 La. Ann. 41. See also, as to vested rights

of corporations under franchises, *Monongahela Co.* v. *United States*, 148 U. S. 329; *Montgomery County* v. *Bridge Co.*, 110 Pa. St. 54, 68; *Walla Walla* v. *Water Co.*, 172 U. S. 1; *Pearsall* v. *Great Northern Ry.*, 161 U. S. 661. Even if no new investment had been made the operation of its lines by the Telegraph Company gave it contractual rights. *City Railway* v. *Citizens' Railroad*, 166 U. S. 587; *Powers* v. *Detroit & G. H. Ry. Co.*, 201 U. S. 544.

The fact that no money was paid to the State does not make the contract void for want of consideration, *Dartmouth College Case*, 4 Wheat. 637; *Erie R. R. Co.* v. *Pennsylvania*, 153 U. S. 628.

The Bush Act denies the Telegraph Company equal protection of the laws by discriminating between it and existing domestic corporations who do not have to pay the tax in order to continue to do business. *American Smelting Co.* v. *Colorado*, 204 U. S. 103; *Yick Wo* v. *Hopkins*, 118 U. S. 369; 3 Clark & Marshall on Corp., § 845; *Rock Island R. R.* v. *Swanger*, 157 Fed. Rep. 783.

A State cannot exact from a foreign corporation engaged in interstate commerce, as a condition precedent to its doing business in that State, a tax or license fee based on its entire capital when the greater part of such capital is in use elsewhere than in that State.

A State may exclude foreign corporations; it may impose terms reasonable or unreasonable, but if admitted at all, the terms of admission must not violate the Federal Constitution. Judson on Taxation, § 169; *Insurance Co.* v. *Morse*, 20 Wall. 445; *Insurance Co.* v. *French*, 18 How. 404; *St. Clair* v. *Cox*, 106 U. S. 350, 356; *Barron* v. *Burnside*, 121 U. S. 186, 200; *Norfolk & Western R. R.* v. *Pennsylvania*, 136 U. S. 114.

The power of a State to exclude, or prescribe the terms of admission of, a foreign corporation is no greater than its general inherent power to tax property within its limits. *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 106, 203; *McCulloch* v. *Maryland*, 4 Wheat. 319, 429.

When a State attempts to impose a tax on capital stock representing instrumentalities of interstate commerce for the privilege of doing intrastate business it violates the commerce clause of the Constitution, and also attempts to tax property beyond its geographic limits which would amount to deprivation of property without due process of law. Cases *supra* and see also *Fargo* v. *Hart*, 193 U. S. 490; *Ashley* v. *Ryan*, 153 U. S. 436; *Union Transit* v. *Kentucky*, 199 U. S. 194.

In no case where this court has sustained privilege, license or occupation taxes has the burden been upon capital stock employed in interstate commerce outside the State such as in *Cotting* v. *Stockyards Co.*, 82 Fed. Rep. 850; *United States* v. *Swift*, 122 Fed. Rep. 529; *Kehrer* v. *Stewart*, 197 U. S. 60; *Armour* v. *Lacey*, 200 U. S. 236.

While a State may, as in *Paul* v. *Virginia*, 8 Wall. 168, exclude or prescribe conditions, the exceptions to this rule have always been stated to be corporations engaged in interstate commerce, *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 98 U. S. 1; or those engaged in employ of the General Government. *Stockton* v. *B. & N. Y. R. R. Co.*, 32 Fed. Rep. 9; *Horn Silver Mining Co.* v. *New York*, 143 U. S. 305. In fact no conditions repugnant to the Federal Constitution can be imposed. *Insurance Co.* v. *Morse*, 20 Wall. 445, 457; *Barron* v. *Burnside*, 121 U. S. 186, 200.

A tax on capital stock of a corporation is a tax on the property of the corporation. Cases *supra* and *Pullman Co.* v. *Pennsylvania*, 141 U. S. 18; *Western Union Tel. Co.* v. *Massachusetts*, 125 U. S. 530; Gray on Limitations of Taxing Power; *Postal Tel. Co.* v. *Adams*, 155 U. S. 588, 696; *Colorado* v. *Pullman Co.*, Riner, J., 1905, U. S. Cir. Ct., unreported.

The court will look to substance rather than form, and unless the tax is limited to what is actually within the jurisdiction of taxing power will strike it down. Cases *supra* and *Railway Co.* v. *Texas*, 210 U. S. 217; *Steamship Co.* v. *Pennsylvania*, 122 U. S. 326; *Postal Tel. Co.* v. *Taylor*, 192 U. S. 64, 73; *Insurance Co.* v. *New York*, 134 U. S. 194. In *Maine*

v. *Grand Trunk Ry. Co.*, 142 U. S. 217; *Powers* v. *Michigan*, 191 U. S. 379, the tax was confined to mileage proportion within the State.

Protection from state interference with interstate commerce ceases to be of force if the State can do indirectly what it cannot do directly. *Brown* v. *Maryland*, 12 Wheat. 419; *Insurance Co.* v. *New York*, 134 U. S. 194, 198; *Gibbons* v. *Ogden*, 9 Wheat. 1. And see also *Pickard* v. *Pullman Co.*, 117 U. S. 34; *Robbins* v. *Taxing District*, 120 U. S. 489; *Leloup* v. *Mobile*, 127 U. S. 640; *Asher* v. *Texas*, 128 U. S. 129; *Stoutenbergh* v. *Hennick*, 129 U. S. 141; *McCall* v. *California*, 136 U. S. 104; *Norfolk & Western* v. *Pennsylvania*, 136 U. S. 114; *Lyng* v. *Michigan*, 135 U. S. 161, 166; *Pembina Co.* v. *Pennsylvania*, 125 U. S. 181; *Emert* v. *Missouri*, 156 U. S. 296; *Hopkins* v. *United States*, 171 U. S. 578, distinguished in *Schollenberger* v. *Pennsylvania*, 171 U. S. 23. And see *Brennan* v. *Titusville*, 153 U. S. 289; *Bateman* v. *Milling Co.*, 1 Tex. Civ. App. 931, 952.

As to the distinction between corporations doing an interstate business and having a *quasi*-public character and those conducting a strictly private business, see *New York* v. *Roberts*, 171 U. S. 658, 664, and as to the right to tax instrumentalities only when subject to jurisdiction by reason of location see cases *supra* and *St. Louis* v. *The Ferry*, 11 Wall. 423; *Louisville Ferry* v. *Kentucky*, 188 U. S. 385; *Adams Express Co.* v. *Ohio*, 165 U. S. 194.

If one State, other than the home State, can tax instrumentalities of commerce used in other States each State may do the same and the actual burden would become so great as to amount to a prohibition against those corporations which, like the Western Union Telegraph Company and the Pullman Company do business in all the States, and which Congress alone can control. Cases *supra* and *Hayes* v. *Pacific Mail*, 17 How. 596; *Morgan* v. *Parham*, 16 Wall. 471; *Commonwealth* v. *Standard Oil Co.*, 101 Pa. St. 119; *Wabash* v. *Illinois*, 118 U. S. 573.

Taxes have been sustained on intrastate business in *Pullman Co.* v. *Adams,* 189 U. S. 420, and other cases, on the ground that the company taxed could abandon its local business; but in *Norfolk & Western* v. *Pennsylvania,* 136 U. S. 114, 120, a tax on ticket office was held to be a burden on the entire business and void. And the Bush Act amounts equally to such a tax.

The judgment of the state court deprives the corporation of its rights granted by Congress under the Post-Road Act of 1866.

*Mr. Frank B. Kellogg,* with whom *Mr. Charles Blood Smith, Mr. Francis B. Daniels* and *Mr. Gustavus S. Fernald* were on the brief, for plaintiff in error, the Pullman Company, in case No. 5, argued simultaneously herewith.[1]

The Bush Act is not a regulation of intrastate commerce of foreign corporations and the judgment of the Supreme Court to that effect cannot make the act such a regulation, nor is the Bush Act an exercise of the police power of the State, nor in a case like this is this court bound by the construction of the statute by the state court. *Spraigue* v. *Thompson,* 118 U. S. 90; *Yick Wo* v. *Hopkins,* 118 U. S. 366; *Stearns* v. *Minnesota,* 179 U. S. 232. This act must be construed as passed by the state legislature and not as amended judicially by the courts. The act relates both to interstate and intrastate business and as such is unconstitutional.

The State cannot exact from a foreign corporation as a condition precedent for doing business in the State a license fee or tax based on capital stock the greater part of which represents property employed outside the State in interstate commerce. Judson on Taxation, § 169; *Insurance Co.* v. *French,* 18 How. 404; *St. Clair* v. *Cox,* 106 U. S. 350; and cases cited in brief for plaintiff in error in No. 4.

The Bush Act is unconstitutional because it impairs the obligation of contracts, deprives the corporation of its prop-

---

[1] For decision in this case, see *post,* p. 56.

erty without due process of law and denies it the equal protection of the laws.

The Pullman Company had lawful contracts with railroad companies in existence when the Bush Act was passed, all of which will be impaired by its exclusion from the State. *Green v. Biddle*, 8 Wheat. 1; *Van Hoffman v. Quincy*, 4 Wall. 535; *Fletcher v. Peck*, 6 Cranch, 87; *Bronson v. Kenzie*, 1 How. 311; *McCracken v. Hayward*, 2 How. 608; *Burton v. Van Ripper*, 16 N. J. L. 7, 11; *Woodruff v. State*, 3 Arkansas, 285; *Bank v. State*, 12 Mississippi, 439.

A State cannot invite a corporation to come into its territory, build up a business and then expel the corporation by unequal taxation. Its right to exclude may be waived. *Seaboard Air Line v. Commission*, 155 Fed. Rep. 792; *Railway Co. v. Ludwig*, 156 Fed. Rep. 152.

*Mr. C. C. Coleman*, with whom *Mr. Fred S. Jackson*, Attorney General of the State of Kansas, was on the brief for defendant in error in this case and in No. 5, argued simultaneously herewith:

The granting of franchises to corporations is entirely within the control of the State and may be accompanied with such conditions as the legislature thinks suitable for the public policy and therefore this case presents no Federal question as the state court has declared that the Bush Act relates only to local business and that construction controls in this court. *Smiley v. Kansas*, 196 U. S. 447.

The act applies to all foreign corporations and so there is no discrimination. As to the right of the State to impose conditions on foreign corporations, see *Horn Silver Mining Co. v. New York*, 143 U. S. 305; *People v. Roberts*, 171 U. S. 661; *Minot v. Railroad Co.*, 18 Wall. 206.

The action of *quo warranto* is proper. *State v. Wilson*, 30 Kansas, 665.

The fact that the corporation was already in the State does not deprive the State of the right to require this license fee.

No vested right had been acquired to remain in the State. *State* v. *American Book Co.,* 65 Kansas, 847; *Postal Tel. Co.* v. *City,* 43 S. E. Rep. 207.

The fact that the statute causes inconvenience does not render it unconstitutional. *St. Louis* v. *Western Union Tel. Co.,* 148 U. S. 92; *Postal Tel. Co.* v. *Baltimore,* 156 U. S. 210; *Western Union Tel. Co.* v. *New Hope,* 187 U. S. 427; *People* v. *Squire,* 145 U. S. 175; *Pabst Brewing Co.* v. *Crenshaw,* 198 U. S. 7, 30; *Lumberville Co.* v. *Commissioners,* 26 Atl. Rep. 711.

The license fee is not a burden on the interstate business of the objecting corporations. It is a local police regulation on local business only, and as it affects only intrastate business falls under *Ratterman* v. *Western Union Tel. Co.,* 127 U. S. 411; *Western Union Tel. Co.* v. *Massachusetts,* 125 U. S. 530; *Western Union Tel. Co.* v. *New York,* 38 Fed. Rep. 352; *Minn. & St. L. Ry. Co.* v. *Beckwith,* 129 U. S. 26; *Sandford* v. *Poe,* 69 Fed. Rep. 546; *Delaware R. R. Tax,* 18 Wall. 206; *Ashley* v. *Ryan,* 153 U. S. 436; *Honduras Com. Co.* v. *State Board,* 54 N. Y. 278; *Henderson Bridge Co.* v. *Kentucky,* 166 U. S. 150; *Ferry Co.* v. *Kentucky,* 183 U. S. 385; *Pembina Co.* v. *Pennsylvania,* 125 U. S. 181, 190; *Postal Tel. Co.* v. *Charleston,* 153 U. S. 692; *Postal Tel. Co.* v. *Norfolk,* 43 S. E. Rep. 297; and see cases cited in opinions below, 75 Kansas, 609, 664.

No grounds exist for the claim that a contract existed between the corporations and the State, or for the assumption that the present law impaired the obligation of any contract between themselves and the State, or between themselves and their patrons. No foreign companies having been admitted to the State prior to the passage of the Bush law, a claim of discrimination under the terms of that law against such corporations seeking to comply with its terms and domestic corporations is clearly without foundation. Foreign companies are given the dignity and privileges of domestic corporations exactly upon the same terms that the same things are granted to domestic corporations. The State

maintains: That the construction of the state statutes is a question for the state courts alone: That the records in these cases present no color of any attempt to deprive the defendants of any of their constitutional rights in the State of Kansas: That the Bush law does not interfere with any duties or obligations of the plaintiffs in error to the Federal Government.

MR. JUSTICE HARLAN, after making the above statement, delivered the opinion of the court.

The above extended statement would seem to be justified by the importance of this case.

The contentions of the company, to which particular attention will be directed, are, in substance, that the requirement that it pay, for the benefit of the permanent school fund of the State, *a given per cent of its authorized capital,* wherever and however employed, as a *condition* of its right to continue to do domestic business in Kansas, is a regulation which, by its necessary operation, directly burdens or embarrasses interstate commerce, and, therefore, is illegal under the commerce clause of the Constitution; further, that such a requirement involves the taxation not only of the company's interstate business everywhere, but equally the property employed by it beyond the limits of the State, a thing which could not be done consistently with the due process of law enjoined by the Fourteenth Amendment.

It will be well to inquire, at the outset, as to the state of the law in respect of local regulations that materially burden and interfere with the freedom of commerce among the States. A review of some of the cases will throw light on the questions now before us, and enable us the better to ascertain the scope and effect of the statute.

In *McCall* v. *People of California,* 136 U. S. 104, 109, a municipal ordinance of San Francisco imposing a license tax of a specified amount upon "every railroad agency" was held to be violative of the commerce clause of the Constitution

when applied to an agent in San Francisco of a railroad company which had its principal place of business in Chicago, and operated a continuous line between Chicago and New York. That agent, conducting his business in San Francisco city and county, solicited there passengers who proposed to travel from Chicago to New York to use the railroad he represented. The court said: "The object and effect of his soliciting agency were to swell the volume of the business of the road. It is one of the *'means'* by which the company sought to increase and doubtless did increase its interstate passenger traffic. It was not incidentally or remotely connected with the business of the road, but was a direct method of increasing that business. The tax upon it therefore was, according to the principles established by the decisions of this court, a tax upon a means or an occupation of carrying on interstate commerce, pure and simple." At the same time, in *Norfolk & Western R. R. Co.* v. *Pennsylvania,* 136 U. S. 114, the court held that a license tax exacted by Pennsylvania upon a railroad corporation of another State, engaged in interstate commerce, for keeping an office in Philadelphia, was a tax on such commerce, and invalid.

A leading authority on the general subject, and which has an important bearing on more than one question in the present case, is that of *Crutcher* v. *Kentucky,* 141 U. S. 47, 51, 57, 59, 62. That case involved the constitutional validity of a statute of Kentucky regulating the agencies of foreign express companies. The statute made it unlawful for the agent of a foreign express company to set up, establish or carry on the business of transportation in Kentucky without first obtaining a license from the Auditor of Public Accounts to carry on such business, and that officer was forbidden to issue the license until the copy of the express company's charter was filed with him, and a statement, verified by oath, showing its assets and liabilities, the amount of its capital stock and how paid, of what its assets consisted, the amount of its losses due and unpaid, and that the company was possessed of an actual capital of at least $150,000, either in cash or safe investments, exclusive of stock

notes. Any person carrying on any business in the State for a transportation or express company, *not incorporated in Kentucky*, without having obtained the required license, was subject to be fined not less than $100 nor more than $500, at the discretion of the jury. The statute specified the fee to be paid for the license, also a certain fee for filing a copy of the company's charter, and still another fee for filing an original or annual statement. The fees prescribed were on account of the company's business in Kentucky, *no discrimination being made between interstate and domestic business done there*. Without obtaining the required license Crutcher acted as agent in Kentucky of the United States Express Company, which was organized under the laws of New York, and was engaged in both interstate and domestic commerce. For acting as such agent without the required license from the State he was indicted, convicted and fined $100. The highest court of Kentucky sustained the conviction and held the statute to be constitutional. Among other things it said: "There is no discrimination made between corporations doing a like business; and the State, although the appellant's company is a foreign company, has the right to license the business and calling of this agent as it would that of the lawyer or merchant whose business is confined to the State alone." The judgment of the Kentucky court was reversed by this court.

Speaking by Mr. Justice Bradley, this court, among other things, said (p. 56): "The law of Kentucky, which is brought in question by the case, requires from the agent of every express company not incorporated by the laws of Kentucky a license from the auditor of public accounts, before he can carry on any business for said company in the State. This, of course, embraces interstate business as well as business confined wholly within the State. It is a prohibition against the carrying on of such business without a compliance with the state law. . . . If a partnership firm of individuals should undertake to carry on the business of interstate commerce between Kentucky and other States, it would not be within the

province of the state legislature to exact conditions on which they should carry on their business, nor to require them to take out a license therefor.  To carry on interstate commerce is not a franchise or a privilege granted by the State; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States; and the accession of mere corporate facilities, as a matter of convenience in carrying on their business, cannot have the effect of depriving them of such right, unless Congress should see fit to interpose some contrary regulation on the subject.

"It has frequently been laid down by this court that the power of Congress over interstate commerce is as absolute as it is over foreign commerce.  Would any one pretend that a state legislature could prohibit a foreign corporation,—an English or a French transportation company, for example,— from coming into its borders and landing goods and passengers at its wharves, and soliciting goods and passengers for a return voyage, without first obtaining a license from some state officer, and filing a sworn statement as to the amount of its capital stock paid in?  And why not?  Evidently because the matter is not within the province of state legislation, but within that of national legislation.  *Inman Steamship Co.* v. *Tinker*, 94 U. S. 238"—citing *Telegraph Co.* v. *Texas*, 105 U. S. 460; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 205, 211; *Phila. Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, 342; *McCall* v. *California*, 136 U. S. 104, 110; *Norfolk & Western Railroad* v. *Pennsylvania*, 136 U. S. 114, 118.  Again: "As was said by Mr. Justice Lamar, in the case last cited, 'It is well settled by numerous decisions of this court, that a State cannot under the guise of a license tax, exclude from its jurisdiction a foreign corporation engaged in interstate commerce, *or impose any burdens upon such commerce* within its limits.'

"We have repeatedly decided that a state law is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce, no matter how specious the pretext may be for imposing it"—citing *Pickard* v. *Pull-*

*man Southern Car Co.,* 117 U. S. 34; *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489; *Leloup* v. *Mobile,* 127 U. S. 640; *Asher* v. *Texas,* 128 U. S. 129; *Stoutenburgh* v. *Hennick,* 129 U. S. 141; *McCall* v. *California,* 136 U. S. 104; *Norfolk & Western Railroad Co.* v. *Pennsylvania,* 136 U. S. 114. Further, in the *Crutcher case* (p. 59): "We do not think that the difficulty is at all obviated by the fact that the express company, as incidental to its main business, (which is to carry goods between different States,) does also some local business by carrying goods from one point to another within the State of Kentucky. This is, probably, quite as much for the accommodation of the people of that State as for the advantage of the company. But whether so or not, it does not obviate the objection that the regulations as to license and capital stock are imposed as conditions on the company's carrying on the business of interstate commerce, which was manifestly the principal object of its organization. These regulations are clearly a burden and a restriction upon that commerce. Whether intended as such or not they operate as such. But taxes or license fees in good faith imposed exclusively on express business carried on wholly within the State would be open to no such objection." The decisions, the court said (p. 62), "are clear to the effect that neither licenses nor *indirect taxation of any kind,* nor any system of state regulation, can be imposed upon interstate any more than upon foreign commerce; and that all acts of legislation producing any such result are, to that extent, unconstitutional and void. And as, in our judgment, the law of Kentucky now under consideration, as applied to the case of the plaintiff in error, is open to this objection, it necessarily follows that the judgment of the Court of Appeals must be reversed."

The court had previously adjudged in *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 204, 211, that a statute of Pennsylvania, requiring both domestic and foreign corporations doing business in that Commonwealth to pay an annual tax rated by the dividends declared and imposed upon *the capital stock of the corporation at a named rate for every dollar of*

*such stock*, was invalid so far as corporations engaged in interstate commerce were concerned. In that case, the court, speaking by Mr. Justice Field, said (p. 204): "Nor does it make any difference whether such commerce is carried on by individuals or by corporations. *Welton* v. *Missouri*, 91 U. S. 275; *Mobile* v. *Kimball*, 102 U. S. 691." Again, in the *Gloucester Ferry case* (p. 211): "While it is conceded that the property in a State belonging to a foreign corporation engaged in foreign or inter-State commerce may be taxed equally with like property of a domestic corporation engaged in that business, we are clear that a tax or other burden imposed on the property of either corporation because it is used to carry on that commerce, or upon the transportation of persons or property, or for the navigation of the public waters over which the transportation is made, is invalid and void as an interference with, and an obstruction of, the power of Congress in the regulation of such commerce." This language was quoted approvingly in *Phila. Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, 343, 344, which held that a tax by Pennsylvania upon the gross receipts of one of *its own corporations,* derived from interstate and foreign commerce, was a regulation of interstate and foreign commerce that was inconsistent with the power of Congress under the Constitution. In *Phila. Steamship Co.* v. *Pennsylvania,* the court, referring to the *Gloucester Ferry case,* said (p. 344): "It is hardly necessary to add that the tax on the capital stock of the New Jersey Company, in that case, was decided to be unconstitutional, because, as the corporation was a foreign one, the tax could only be construed as a tax for the privilege or franchise of carrying on its business, and that business was interstate commerce."

In *Leloup* v. *Port of Mobile,* 127 U. S. 640, 645, the court, speaking by Mr. Justice Bradley, said (p. 645): "The question is squarely presented to us, therefore, whether a State, as a condition of doing business within its jurisdiction, may exact a license tax from a telegraph company, a large part of whose business is the transmission of messages from one State to an-

other and between the United States and foreign countries, and which is invested with the powers and privileges conferred by the act of Congress passed July 24th 1866, and other acts incorporated in Title LXV of the Revised Statutes? Can a State prohibit such a company from doing such a business within its jurisdiction, unless it will pay a tax and procure a license for the privilege? If it can, it can exclude such companies, and prohibit the transaction of such business altogether. We are not prepared to say that this can be done.

"Ordinary occupations are taxed in various ways, and, in most cases, legitimately taxed. But we fail to see how a State can tax a business occupation when it cannot tax the business itself. Of course, the exaction of a license tax as a condition of doing any particular business, is a tax on the occupation; and a tax on the occupation of doing a business is surely a tax on the business."

In the recent case of *Galveston, Harrisburg &c. Ry. Co.* v. *Texas*, 210 U. S. 217, 227, which involved the validity of a Texas statute imposing an annual tax "*equal to* one per cent *of* its gross receipts" on each railroad *lying wholly within that State*. The railroads there concerned lay wholly within Texas, but, this court said, they connected with other lines, and a part, and in some instances much the larger part, of their gross receipts, were derived from the carriage of passengers and freight coming from, or destined to, points without the State. The contention by the railroad company was that the tax was a burden on interstate commerce, and invalid, so far as it was *based on* or was measured by receipts derived from interstate transportation. That view was sustained. The court said: "Neither the state courts nor the legislatures, by giving the tax a particular name or by the use of some form of words, can take away our duty to consider its nature and effect. If it bears upon commerce among the States so directly as to amount to a regulation in a relatively immediate way, it will not be saved by name or form. *Stockard* v. *Morgan*, 185 U. S. 27, 37; *Asbell* v. *Kansas*, 209 U. S. 251, 254, 256.

"We are of opinion that the statute levying this tax does amount to an attempt to regulate commerce among the States. The distinction between a tax 'equal to' one per cent of gross receipts and a tax of one per cent of the same, seems to us nothing, except where the former phrase is the index of an actual attempt to reach the property and to let the interstate traffic and the receipts from it alone. We find no such attempt or anything to qualify the plain inference from the statute taken by itself. On the contrary, we rather infer from the judgment of the state court and from the argument on behalf of the State that another tax on the property of the railroad is upon a valuation of that property taken as a going concern. This is merely an effort to reach the gross receipts, not even disguised by the name of an occupation tax, and in no way helped by the words 'equal to.'

"Of course, it does not matter that the plaintiffs in error are domestic corporations *or that the tax embraces indiscriminately gross receipts from commerce within as well as. outside of the State.*"

So in *Brennan* v. *Titusville*, 153 U. S. 289, 303, which involved the validity of an ordinance imposing a license tax on those engaged in the business of soliciting orders on behalf of manufacturers of goods, the court said (p. 303): "It is clear, therefore, that this license tax is not a mere police regulation, simply inconveniencing one engaged in interstate commerce, and so only indirectly affecting the business, but is a direct charge and burden upon that business; and if a State may lawfully exact it, it may increase the amount of the exaction until all interstate commerce in this mode ceases to be possible. And notwithstanding the fact that the regulation of interstate commerce is committed by the Constitution to the United States, the State is enabled to say that it shall not be carried on in this way, and to that extent to regulate it." Again, in *Ashley* v. *Ryan*, 153 U. S. 436, 440, the court said (p. 440): "Whether this charge be viewed as a tax, a license, or a fee, if its exaction violated the interstate com-

merce clause of the Constitution of the United States, or involved the assertion of the right of a State to exercise its powers of taxation beyond its geographical limits, it was void, whatever might be the technical character affixed to the exaction." To the same effect is *Caldwell* v. *North Carolina*, 187 U. S. 622.

The authorities cited show that this court has guarded with both diligence and firmness the freedom of interstate commerce against hostile state or local action, as such action has been manifested by regulations operating, in some instances, directly, in others indirectly, upon the means or instruments employed in that commerce. This has been done without violating the principle that an interstate carrier, entering a State for purposes of its business, is subject to local regulations that in their essence and purpose only incidentally affect interstate commerce, but are established in good faith for the protection, safety, comfort and convenience of the people, are not in themselves in any real, just sense an obstruction to or in conflict with the substantial rights of those engaged in interstate commerce, but are referable to the police powers of the State, and to be respected until Congress covers the subject by legislation. *Cooley* v. *Port Wardens*, 12 How. 299, 320; *Sherlock* v. *Alling*, 93 U. S. 99, 104; *Morgan's Louisiana & T. R. & S. S. Co.* v. *Board of Health*, 118 U. S. 455, 463; *Smith* v. *Alabama*, 124 U. S. 465; *Nashville, C. & St. L. R. Co.* v. *Alabama*, 128 U. S. 96, 100; *N. Y. & N. H. & H. R. R. Co.* v. *New York*, 165 U. S. 628, 631, 632; *Missouri, Kansas & Texas Ry. Co.* v. *Haber*, 169 U. S. 613, 626; *Lake Shore & M. S. R. Co.* v. *Ohio*, 173 U. S. 285, 297. We are aware of no decision by this court holding that a State may, by any device or in any way, whether by a license tax, in the form of a "fee," or otherwise, burden the interstate business of a corporation of another State, although the State may tax the corporation's property regularly or permanently located within its limits, where the ascertainment of the amount assessed is made "dependent

*in fact* on the value of its property *situated within the State.*"
*Postal Telegraph Co.* v. *Adams*, 155 U. S. 688, 696; *Leloup* v.
*Mobile*, 127 U. S. 640, 649. On the contrary, it is to be de-
duced from the adjudged cases that a corporation of one
State, authorized by its charter to engage in lawful commerce
among the States, may not be prevented by another State
from coming into its limits for all the legitimate purposes of
such commerce. It may go into the State without obtaining
a license from it for the purposes of its interstate business, and
without liability to taxation there, *on account of such business.*

But it is said that none of the authorities cited are pertinent
to the present case, because the State expressly disclaims any
purpose by the statute in question to obstruct or embarrass
interstate commerce, but seeks only to prevent the Telegraph
Company from entering the field of domestic business in
Kansas without its consent and without conforming to the
requirements of its statute. But the disavowal by the State
of any purpose to burden interstate commerce cannot con-
clude the question as to the fact of such a burden being im-
posed, or as to the unconstitutionality of the statute as shown
by its necessary operation upon interstate commerce. If the
statute, reasonably interpreted, either directly or by its
necessary operation, burdens interstate commerce, it must
be adjudged to be invalid, whatever may have been the pur-
pose for which it was enacted, and although the company may
do both interstate and local business. This court has re-
peatedly adjudged that in all such matters the judiciary will
not regard mere forms, but will look through forms to the
substance of things. Such is an established rule of con-
stitutional construction as the adjudged cases abundantly
show.

In *Henderson &c.* v. *Mayor*, 92 U. S. 259, 268, which in-
volved the question whether a statute of New York was in
any real sense a regulation of commerce with foreign nations,
the court said that in whatever language a statute may be
framed, its purpose must be determined by its natural and

reasonable effect.  In *Mugler* v. *Kansas*, 123 U. S. 623, 661, it was said that the courts, when determining whether a statute is consistent with the fundamental law, must not deem themselves "bound by mere forms, nor are they to be misled by mere pretenses.  They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority."  In *Lyng* v. *Michigan*, 135 U. S. 161, 166, it was adjudged that a State could not lay a tax on interstate commerce, "in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, for the reason that such taxation is a burden on that commerce and amounts to a regulation of it, which belongs solely to Congress."  In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 497, it was attempted to support a local regulation about drummers upon the ground that no discrimination was made between domestic and foreign drummers—that they were all taxed alike.  But that device or form of taxation did not prevail, the court saying: "That does not meet the difficulty.  Interstate commerce cannot be taxed at all, even though the same amount of tax should be laid on domestic commerce or that which is carried on solely within the State."  In *Minnesota* v. *Barber*, 136 U. S. 313, 319, 326, the particular statute there assailed as repugnant to the Constitution of the United States was not saved by the fact that it was applicable to citizens of all the States, including citizens of the State which enacted it.  This court said (p. 319): "There may be no purpose upon the part of a legislature to violate the provisions of that instrument, and yet a statute enacted by it, under the forms of law, may, by its necessary operation, be destructive of rights granted or secured by the Constitution.  In such cases, the courts must sustain the supreme law of the land by declaring the statute unconstitutional and void."  It was further said in that case (p. 326)

"that a statute may, upon its face, apply equally to the people of all the States, and yet be a regulation of interstate commerce which a State may not establish. A burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute."

In *Brimmer* v. *Rebman*, 138 U. S. 78, 81, the question arose as to the validity of a Virginia statute making it unlawful to offer for sale, within the limits of that State (p. 80) "any fresh meats (beef, veal, or mutton) which shall have been slaughtered one hundred miles or over from the place at which it is offered for sale, until and except it has been inspected and approved" as provided in the statute. The preamble of the statute recited that unwholesome meats were being offered for sale in Virginia. Such recital was held not to conclude the question as to the conformity of the statute with the Constitution. Despite the avowal by the State that its object, by the statute, was to prevent the offering of unwholesome meats for sale in Virginia, this court adjudged it to be unconstitutional, saying (p. 81): "Is the statute now before us liable to the objection that, by its necessary operation, it interferes with the enjoyment of rights granted or secured by the Constitution? This question admits of but one answer." "The fees exacted, under the Virginia statute, for the inspection of beef, veal and mutton, the product of animals slaughtered one hundred miles or more from the place of sale, are, in reality, a tax; and 'a discriminating tax imposed by a State, operating to the disadvantage of the products of other States when introduced into the first-mentioned State, is, in effect, a regulation in restraint of commerce among the States, and, as such, is a usurpation of the powers conferred by the Constitution upon the Congress of the United States.' *Walling* v. *Michigan*, 116 U. S. 446, 455. Nor can this statute be brought into harmony with the Constitution by the circumstance that it purports to apply alike to the citizens of

all the States, including Virginia; for, 'a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute.' *Minnesota* v. *Barber*, 136 U. S. 313, 319; *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489, 497. If the object of Virginia had been to obstruct the bringing into that State, for use as human food, of all beef, veal and mutton, however wholesome, from animals slaughtered in distant States, that object will be accomplished if the statute before us be enforced."

Looking, then, at the natural and reasonable effect of the statute, disregarding mere forms of expression, it is clear that the making of the payment by the Telegraph Company, as a charter fee, of a given per cent *of its authorized capital*, representing, as that capital clearly does, *all* of its business and property, both within and *outside of the State*, a *condition* of its right to do local business in Kansas, is, in its essence, not simply a tax for the privilege of doing local business in the State, but a burden and tax on the company's interstate business and on its property located or used outside of the State. The express words of the statute leave no doubt as to what is the *basis* on which the fee, specified in the state statute, rests. That fee, plainly, is not based on such of the company's capital stock as is represented in its local business and property in Kansas. The requirement is a given per cent of the company's authorized capital, that is, all its capital, wherever or however employed, whether in the United States or in foreign countries, and whatever may be the extent of its lines in Kansas as compared with its lines outside of that State. What part of the fee exacted is to be attributed to the company's domestic business in Kansas and what part to interstate business, the State has not chosen to ascertain and declare in the statute. It strikes at the company's entire business wherever conducted and its property wherever located, and, in terms, makes it a *condition* of the telegraph

company's right to transact purely local business in Kansas that it shall contribute for the benefit of the state school fund a given per cent of its whole authorized capital, representing all of its property and all its business and interests everywhere.

In *Western Union Tel. Co.* v. *Massachusetts*, 125 U. S. 530, 549, 552, a tax nominally upon the shares of the capital stock of the company was held to be in effect a tax only on property owned and used by the company in Massachusetts, because and *only because* the basis established for the ascertainment of the value of such property was *the proportion of the company's lines in the State to their entire length throughout the whole country*. Such a tax was held not to be forbidden by the Constitution, because *based* on the company's stock representing only its business and its property inside the State. In *Ratterman* v. *Western Union Tel. Co.*, 127 U. S. 411, it was held that a single tax on the receipts of a telegraph company, some of which were derived from interstate commerce and some from *intra*state commerce, but capable of separation, was invalid *to the extent that the receipts were derived from interstate commerce*. The court was confronted with the same situation in *Leloup* v. *Port of Mobile*, 127 U. S. 640, 647, which case involved the validity of a city ordinance imposing, generally, a specified license tax, "on telegraph companies." The ordinance was held invalid because the tax had reference to the entire business of the Telegraph Company, interstate and domestic, without any distinction being made between the different kinds of business. It was urged in that case that a portion of the Telegraph Company's business was wholly internal to the State and, therefore, was taxable by the State. To this view the response of the court was: "But that fact does not remove the difficulty. The tax *affects* the *whole business without discrimination*. There are sufficient modes in which the internal business, if not already taxed in some other way, may be subjected to taxation, without the imposition of a tax which covers the entire operations of the company." So, in the case now before us, the exaction,

as a condition of the privilege of continuing to do or doing local business in Kansas, that the Telegraph Company shall pay *a given per cent of its authorized capital stock,* is, for every practical purpose, a tax both on the company's local business in Kansas, and on its interstate business or on the privilege of doing interstate business; for, the statute, by its necessary operation, will accomplish precisely the result that would have been accomplished had it been made, *in express words,* a condition of doing local business that the Telegraph Company should submit to taxation upon both its interstate *and* intrastate business and upon its interests and property everywhere, as represented by its capital stock. The exaction made by the Kansas statute is as much a tax on the interstate business of the company and on its property outside of the State as a fee or tax on the sale of an article imported only for sale or as a tax on the occupation of an importer would be a tax on the property imported, *Brown* v. *Maryland,* 12 Wheat. 419, 444; or that a tax on the stock of the United States is a tax on the contract under which it was issued, and a tax on the power to borrow money on the credit of the United States, *Weston* v. *Charleston,* 2 Pet. 449, 467, 468; or that a tax on the salary of an officer of the United States would be a tax on the means employed by the government of the Union to execute its constitutional powers, *Dobbins* v. *Erie County,* 16 Pet. 435, 449; or that a tax on an ordinary bill of lading for property taken out of a State would be a tax on the property covered by that instrument, *Almy* v. *California,* 24 How. 169; or that a tax on the amount of sales made by an auctioneer would be a tax on the goods sold, *Cook* v. *Pennsylvania,* 97 U. S. 566, 573. But, as already said, what part of the fee exacted by Kansas is to be attributed to intrastate business and what part to interstate business the State has not chosen to ascertain and declare. It has seen proper to exact a specified per cent *of* the authorized capital of the Telegraph Company, representing, necessarily, all its business, interstate and intrastate, and all

its property interests in and out of the State. It is important here to observe—indeed, the contrary could not be asserted— that the Telegraph Company lawfully entered Kansas, with the consent of both the Territory and State, for the purposes of its business of every kind long before, and was legally there when, the Bush Act was passed. The State concedes its right to continue in such business in Kansas, if it will comply with the statute in question, and pay the fee demanded; and only because of such refusal it seeks the aid of the court to oust the company from the State, so far as local business is concerned, unless it shall, by paying such fee, contribute—that is the proper word—a given per cent of all its capital for the support of the schools of the State. The State knows that the Telegraph Company, in order to accommodate the general public and make its telegraphic system effective, must do all kinds of telegraphic business. Yet, it seeks to enforce a regulation requiring the company by paying the "fee" in question to assent to its interstate business being burdened and its property outside of Kansas being taxed in order that it may continue to conduct a business concededly beneficial to the public—a right lawfully acquired from the United States when Kansas was a Territory, and exercised, consistently with the statutes of the State for many years after Kansas was admitted as a State of the Union.

But it is said to be well settled that a State, in the exercise of its reserved powers, may prescribe the *terms* on which a foreign corporation, whatever the nature of its business, may enter and do business within its limits.

It is true that in many cases the *general* rule has been laid down that a State may, if it chooses to do so, exclude foreign corporations from its limits, or impose such terms and conditions on their doing business in the State as in its judgment may be consistent with the interests of the people. But those were cases in which the particular foreign corporation before the court was engaged in ordinary business and not directly or regularly in interstate or foreign commerce. In *Paul* v.

*Virginia,* 8 Wall. 168, which sustained the power of the State to exclude foreign insurance companies from its limits, or to impose conditions upon their entering the State for purposes of its business, the court said (p. 182): "It is undoubtedly true, as stated by counsel, that the power conferred upon Congress to regulate commerce includes as well commerce carried on by corporations as commerce carried on by individuals. . . . This state of facts forbids the supposition that it was intended in the grant of power to Congress to exclude from its control the commerce of corporations. The language of the grant makes no reference to the instrumentalities by which commerce may be carried on; it is general, and includes alike commerce by individuals, partnerships, associations, and corporations. . . . . The defect of the argument lies in the character of their business. *Issuing a policy of insurance is not a transaction of commerce.* . . . Such contracts are not inter-state transactions, though the parties may be domiciled in different States." In *Pensacola Tel. Co.* v. *Western Union Tel. Co.,* 96 U. S. 1, 12, 13, the case of *Paul* v. *Virginia* was referred to and the above extract made from its opinion. And the court, speaking by Chief Justice Waite in the *Pensacola case,* said (p. 12): "We are aware that, in *Paul* v. *Virginia* (8 Wall. 168), this court decided that a State might exclude a corporation of another State from its jurisdiction, and that corporations are not within the clause of the Constitution which declares that ' the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States.' Art. 4, sect. 2. *That was not, however, the case of a corporation engaged in inter-state commerce;* and enough was said by the court to show, that, if it had been, *very different questions would have been presented.*"

Whatever may be the extent of the State's authority over intrastate business, was it competent for the State to require that the Telegraph Company—which surely had the right to enter and remain in the State for interstate business—as a *condition* of its right to continue doing domestic business in

Kansas should pay, in the form of a fee, a specified per cent *of* its capital stock representing the interests, property and operations of the company not only in Kansas but throughout the United States and foreign countries? Is such a regulation consistent with the power of Congress to regulate commerce among the States, or with rights, growing out of such commerce, and secured by the Constitution of the United States? Can the State, in this way, relieve its own treasury from the burden of supporting its public schools, and put that burden, in whole or in part, upon the interstate business and property of foreign corporations? Can such a regulation be deemed constitutional any more than one requiring the company, as a condition of its doing intrastate business, that it should surrender its right, for instance, to invoke the protection of the Constitution when it is proposed to deprive it of its property without due process of law, or to deny it the equal protection of the laws? In *Lafayette Ins. Co.* v. *French et al.,* 18 How. 404, 407, the court, speaking by Mr. Justice Curtis, said (p. 407): "A corporation created by Indiana can transact business in Ohio only with the consent, express or implied, of the latter State, 13 Pet. 519. This consent may be accompanied by such conditions as Ohio may think fit to impose; and these conditions must be deemed valid and effectual by other States, and by this court, *provided they are not repugnant to the Constitution or laws of the United States.*" In *Southern Pacific Company* v. *Denton,* 146 U. S. 202, 207, the court considered the question of the validity of a Texas statute relating to foreign corporations desiring to transact business in that State. That statute provided that the application of the corporation to do business in the State should contain a stipulation that the permit be subject to certain provisions of the statute, one of which was that the permit should become null and void if the corporation, being sued in a state court, should remove the case into a court of the United States upon the ground of the diverse citizenship of the parties or of local prejudice against such corporation. Dealing

.with that point this court, speaking by Mr. Justice Gray, said (p. 207): "But that statute, requiring the corporation, as a condition precedent to obtaining a permit to do business within the State, *to surrender a right and privilege secured to it by the Constitution and laws of the United States,* was unconstitutional and void, and could give no validity or effect to any agreement or action of the corporation in obedience to its provisions"—citing *Insurance Co.* v. *Morse,* 20 Wall. 445; *Barron* v. *Burnside,* 121 U. S. 186; *Texas Land Co.* v. *Worsham,* 76 Texas, 556. See also to the same effect *Martin* v. *Baltimore & Ohio R. R. Co.,* 151 U. S. 673, 684; *St. Clair* v. *Cox,* 106 U. S. 350, 356; *Barrow Steamship Co.* v. *Kane,* 170 U. S. 100, 110, 111. In the above case of *Barron* v. *Burnside* (which was cited with approval in the *Denton case*), this court, speaking by Mr. Justice Blatchford, unanimously held (p. 200): "As the Iowa statute makes the right to a permit *dependent upon the surrender by the foreign corporation of a privilege secured to it by the Constitution and laws of the United States, the statute requiring the permit must be held to be void.* . . . In all the cases in which the court has considered the subject of the granting by a state to a foreign corporation of its consent to the transaction of business in the state, it has uniformly asserted *that no conditions can be imposed by the state which are repugnant to the Constitution and laws of the United States."* So in *Barrow Steamship Co.* v. *Kane,* 170 U. S., above cited, Mr. Justice Gray, delivering the unanimous judgment of the court, said (p. 111): "Statutes requiring foreign corporations, as a condition of being permitted to do business within the State, to stipulate not to remove into the courts of the United States suits brought against them in the courts of the State, have been adjudged to be unconstitutional and void." If a domestic corporation engaged in the business of soliciting orders for goods manufactured, sold and delivered in a State, should, in addition, solicit orders for goods manufactured in and to be brought from another State for delivery, could the former State make it a *condition* of the right to engage in local

business within its limits that the corporation pay a given per cent of *all* fees or commissions received by it in its business, interstate and domestic? There can be but one answer to this question, namely, that such a condition would operate as a direct burden on interstate commerce, and therefore would be unconstitutional and void. Consistently with the Constitution no court could, by any form of decree, recognize or give effect to or enforce such a condition.

We repeat that the statutory requirement that the Telegraph Company shall, as a condition of its right to engage in local business in Kansas, first pay into the state school fund a given per cent of its authorized capital, representing all its business and property everywhere, is a burden on the company's interstate commerce and its privilege to engage in that commerce, in that it makes both such commerce, as conducted by the company, and its property outside of the State, contribute to the support of the State's schools. Such is the necessary effect of the statute, and that result cannot be avoided or concealed by calling the exaction of such a per cent of its capital stock a "fee" for the privilege of doing local business. To hold otherwise is to allow form to control substance. It is easy to be seen that if every State should pass a statute similar to that enacted by Kansas not only the freedom of interstate commerce would be destroyed, the decisions of this court nullified and the business of the country thrown into confusion, but each State would continue to meet its own local expenses not only by exactions that directly burdened such commerce, but by taxation upon property situated beyond its limits. We cannot fail to recognize the intimate connection which, at this day, exists between the interstate business done by interstate companies and the local business which, for the convenience of the people, must be done or can generally be better and more economically done by such interstate companies rather than by domestic companies organized to conduct only local business. It is of the last importance that the freedom of interstate commerce shall

not be trammelled or burdened by local regulations which, under the guise of regulating local affairs, really burden rights secured by the Constitution and laws of the United States. While the general right of the States to regulate their strictly domestic affairs is fundamental in our constitutional system and vital to the integrity and permanence of that system, that right must always be exerted in subordination to the granted or enumerated powers of the General Government, and not in hostility to rights secured by the Supreme Law of the Land.

We need not stop to discuss at length the specific question whether the State can by any regulation make the property of the company, outside of Kansas, contribute directly to the support of its schools; such being the effect of the requirement that it pay into the state treasury, for the benefit of the state school fund, a given per cent of all its capital stock as a condition of its doing local business in Kansas. It is firmly established that, consistently with the due process clause of the Constitution of the United States, a State cannot tax property located or existing permanently beyond its limits. *Louisville &c.* v. *Kentucky*, 188 U. S. 385, 398; *Union Transit Co.* v. *Kentucky*, 199 U. S. 194, 209.

It is said that the conclusions here announced are not in harmony with some cases heretofore decided by this court. This suggestion is one of serious import, and cannot be passed without consideration, although the careful examination of the cases may greatly extend this opinion. In support of the view just stated reliance is placed particularly on *Osborne* v. *Florida*, 164 U. S. 650; *Pullman Co.* v. *Adams*, 189 U. S. 420; *Allen* v. *Pullman Palace Car Co.*, 191 U. S. 171; and *Security Mutual Life Ins. Co.* v. *Prewitt*, 202 U. S. 246, 248.

What was the case of *Osborne* v. *Florida?* A certain statute of that State made it a misdemeanor for one to act as agent in the State of an express company doing business there without the payment of a license tax, *the amount of which depended upon the number of inhabitants in the city, town or village* where the

business was *conducted.* Osborne, without obtaining such a license, and having acted as agent, in Florida, of a Georgia corporation engaged in interstate as well as intrastate business, was proceeded against criminally under the statute. He contended that the statute was invalid, in that it assumed to regulate interstate commerce. The Supreme Court of Florida held that the statute had no application to interstate commerce, and affected only the business done in the State that was "local" in its character. And this court, upon writ of error to the Supreme Court of Florida, held that the company could "conduct its interstate business without paying the slightest heed to the act, because it does not apply to or in any degree affect the company in regard to that portion of its business which it has the right to conduct without regulation from the State." As thus construed, the statute was held not to be a regulation of interstate commerce. This court recognizing the principle announced in *Crutcher* v. *Kentucky,* said that "so long as the regulation as to license or taxation *does not refer to* and *is not imposed upon the business of the company which is interstate,* there is no interference with that commerce by the State statute." Let it be observed that the license taxes prescribed by Florida were such as to make it clear that its statute applied, and was intended to be applied, only to domestic business within Florida, as measured by *the number of inhabitants of the city or town where the business was conducted.* It was not imposed on any basis that had reference either to the interstate business or to the property of the company outside of the State. It imposed no burden whatever on interstate business, nor put any obstacle in the way of doing such business; whereas, the statute here involved prohibits a foreign corporation from doing any local business in Kansas unless such corporation first pays into the State's school fund a tax, or, which is the same thing, a fee, in the form of a given *per cent of all its capital; representing all of its business, property and interests everywhere.* The Florida case is somewhat similar in principle to that of *Western Union Tel. Co.* v. *Massachusetts,*

above cited, in which it was held that a state tax on the capital stock of the Telegraph Company was valid when measured, as it was in that case, not by its entire capital, but by the proportion of the company's lines in the State to their entire length throughout the entire country. So, in *Osborne* v. *Florida* the tax was not imposed on the basis of the business of the company, interstate and intrastate, or either separately, but was made to depend alone on the number of inhabitants in the particular city or town where its agency was established. It is manifest that what has been said in the present case is in perfect harmony with the decision in the *Osborne case.*

As to *Pullman Co.* v. *Adams*, 189 U. S. 420, 429, we perceive nothing in the judgment in that case that conflicts with what is herein said. That case involved the validity of a tax of a certain amount imposed by Mississippi on *each* sleeping and palace car company carrying passengers "from one point to another *within the State,*" and so many cents per mile "for each mile of railroad track over which the company runs its cars *in this State.*" It was contended that this tax was an interference with commerce among the States. It is stated in the opinion that the sleeping cars of the Pullman Company, an Illinois corporation, "were carried by various railroad companies, and all of them were carried into the State from another State, or out of the State to another State, or both. But such cars in their passage also carried passengers from point to point within the State, and a specific fare was collected by the servants of the Pullman Company." It was contended by the company that the state constitution made it a common carrier, and, in effect, compelled it to assume the burden of carrying local passengers, although its receipts from purely local business were less than the expense incurred in carrying it on. But the State Supreme Court held that view of the state constitution to be fallacious. And this court said: "If the clause of the State constitution referred to were held to impose the obligation supposed and to be valid, we assume, without discussion, that the tax would be invalid. *For then it*

*would seem to be true that the State constitution and the statute combined would impose a burden on commerce between the States analogous to that which was held bad in Crutcher* v. *Kentucky,* 141 U. S. 47. On the other hand, if the Pullman Company, whether called a common carrier or not, had the right to choose between what points it would carry, and therefore to give up the carriage of passengers from one point to another within the State, the case is governed by *Osborne* v. *Florida,* 164 U. S. 650. The company cannot complain of being taxed for the privilege of doing a local business which it is free to renounce. Both parties agree that the tax is a privilege tax. As the validity of the tax is thus bound up with the effect of the section of the State constitution, we think that the Pullman Company was entitled to know how it stood under the latter, and that a judgment against it could not be justified by reasoning which leaves that point obscure. We are somewhat embarrassed in dealing with the case, because we are not quite certain whether we rightly interpret the intimations upon the subject in the judgment under review. If the constitution of Mississippi should be read as imposing an obligation to take local passengers, the question for us might be which, if not both, the clause of the constitution or the tax act is invalid. But we assume that the opinion of the Supreme Court of Mississippi intends to meet the difficulty frankly, and when it says that the argument against the tax drawn from the above interpretation of the constitution is fallacious, we take it as meaning that no such interpretation will be attempted in the future, and we take it so the more readily that we can see no ground for a different view. If we are right in our understanding the judgment of the Supreme Court was correct for the reason sufficiently stated above." So, that what was actually decided in the *Adams case* was that the company was under no obligation to take local passengers, but if it chose to do that kind of business the privilege for doing it could be taxed by the State. The court did not hold that the State could, in any form, directly burden interstate commerce. It really held to the contrary.

The *Adams case* differs from the present one in this, that while the Mississippi code imposed no other condition upon the Pullman Company doing local business in that State than that it should pay a certain license tax on that account—which tax, it may be observed, is not at all disproportioned to such local business and, therefore, not to be regarded as a mere device to reach or burden the interstate commerce of the company—the statute of Kansas forbids the doing of local business within its limits by a corporation of another State or foreign country, except subject to the condition that such corporation first pay to the State a given per cent of its entire capitalization representing the value of all its business, property and interests within and without the State, thereby placing a direct burden on the privilege or franchise of transacting interstate commerce and taxing property rights beyond the jurisdiction of the State for purposes of taxation. That the Western Union Telegraph Company is engaged in both interstate and intrastate commerce is no reason, in itself, why Kansas may not, in good faith, require it to pay a license tax strictly on account of local business done by it in that State. But it is altogether a different thing for Kansas to deny it the privilege of doing such local business, beneficial to the public, except on condition that it shall *first* pay to the State a given per cent of all its capital stock, representing all of its property, wherever situated, and all its business in and outside of the State.

Nor is there any conflict between the views we have expressed and the decision in *Allen* v. *Pullman Palace Car Co.*, 191 U. S. 171, 178, 179. One of the questions in that case was as to the constitutional validity of a Tennessee statute, passed in 1887, which required every company operating sleeping cars and doing business in that State to pay, as a privilege tax, "on each car, per annum, $500." The Pullman Car Company operated sleeping cars in Tennessee under a contract with railroad companies traversing the State. The gross receipts of the companies from lines running into the State were, annually, about $500,000, and only about $25,000 annually from pas-

sengers carried locally in Tennessee.  The cars actually used
on these lines during each year numbered over one hundred.
The court in that case referred to *Pickard* v. *Pullman Southern
Car Co.*, 117 U. S. 34, which involved the validity of a Tennes-
see act of 1877 imposing a license tax privilege of $50 annually,
for each sleeping car or coach used on railroads in the State and
said (p. 178): "It was held [in the *Pickard case*] that the tax
was a burden upon interstate commerce and void because of
the exclusive power of Congress to regulate commerce between
the States.  Unless the statute now under consideration can be
distinguished from the one then construed, the *Pickard case* is
decisive of the present case.  Both taxes were imposed under
the power granted by the constitution of Tennessee to lay a
privilege tax.  This power is held by the Supreme Court of the
State to give a wide range of legislative discretion.  Any occu-
pation, business, employment or the like, affecting the public,
may be classed and taxed as a privilege.  *K. & O. Railroad*
v. *Harris*, 99 Tennessee, 684.  In the act of 1877 the running
and using of sleeping cars on railroads in the State, when the
cars are not owned by the railroads upon which they are run, is
declared to be a privilege.  Under the act of 1887, the tax is
specifically imposed upon a privilege.  Under the act of 1877,
the tax imposed was fifty dollars for each car or coach used or
run over the road.  Under the act of 1887, each company
doing business in the State is required to pay five hundred
dollars per annum for the same privilege.  The distinction, ex-
cept in the amount of annual tax exacted, is without sub-
stantial difference.  Under the earlier act the tax is required
for the privilege of running and using sleeping cars on rail-
roads, not owning the cars.  In the later act it is exacted for
the privilege of doing business in the State.  This business
consists of running sleeping cars upon railroads not owning
the cars and is precisely the privilege to be paid for under the
first act, neither more nor less.  *In neither act is any distinction
attempted between local or through cars or carriers of passengers.*
The railroads upon which the cars are run are lines traversing

the State but not confined to its limits. The cars of the Pullman Company run into and beyond the State as well as between points within the State. The act in its terms applies to cars running through the State as well as those whose operation is wholly *intra*-state. It applies to all alike, and requires payment for the privilege of running the cars of the company regardless of the fact whether used in interstate traffic or in that which is wholly within the borders of the State." "The statute now under consideration requires payment of the sum exacted for the privilege of doing any business when the principal thing to be done is interstate traffic. We are not at liberty to read into the statute terms not found therein or necessarily implied, with a view to limiting the tax to local business, which the legislature in the terms of the act impose upon the entire business of the company. We are of opinion that taxes exacted under the act of 1887 are void as an attempt by the State to impose a burden upon interstate commerce." Again, in the same case, the court sustained the validity of a, Tennessee act of 1889, which applied "strictly to business done [by sleeping-car companies] in the transportation of passengers taken up at one point in the State and transported wholly within the State to another point therein." This court, while recognizing as former cases had done, the exclusive right of Congress to regulate interstate traffic, said that "the corresponding right of the State to tax and control the internal business of the State, although thereby foreign or interstate commerce may be indirectly affected, has been recognized with equal clearness"—citing *Osborne* v. *Florida,* 164 U. S. 650. It would seem to be too clear to admit of doubt that the principles in the *Allen case* are substantially those herein announced. Indeed, we could not hold otherwise than we do in the present case without overruling or materially modifying the principles announced in the *Allen case.* In the *Allen case* the license tax there in question under the Tennessee act of 1887 was imposed generally on account of each sleeping car used on railroads traversing the State, *without any discrimination being made be-*

*tween cars transporting interstate passengers and those transporting local passengers.* On that ground the tax was held to be void. In the present case the State of Kansas demands, in the form of a fee, a given per cent of all the capital of the foreign corporation, without any discrimination between the capital representing the business and property of the Telegraph Company outside of the State and the capital representing such of its business and property as are wholly local to the State. And it seeks the aid of the court to oust the Telegraph Company from continuing to do business in the State, so far as local business is concerned, because and only because it will not surrender its immunity from state taxation in reference to its interstate business and its property outside of Kansas.

We come now to the case of *Security Mutual Life Insurance Co.,* v. *Prewitt,* 202 U. S. 246, 257, which case, it is contended, necessarily determines the present question in favor of the State of Kansas. In the *Prewitt case* this court sustained the constitutional validity of a Kentucky statute providing, among other things, that if a foreign *insurance* company should bring a suit in a Federal court against a citizen of Kentucky, or being itself sued in a state court should remove the suit to the Federal court, without the consent of the other party, any permit previously granted to it to do business in Kentucky should be forthwith revoked by the State Insurance Commissioner and the fact of such revocation published in some newspaper of general circulation in the State. No other question was determined. The court regarded the question as concluded in favor of the State by the decision in *Insurance Company* v. *Morse,* 20 Wall. 445. It said (p. 257): "As a State has power to refuse permission to a foreign insurance company to do business at all within its confines, and as it has power to withdraw that permission when once given, without stating any reason for its action, the fact that it may give what some may think a poor reason or none for a valid act is immaterial." The vital difference between the *Prewitt case* and the one now before us is that the business of the

insurance company, involved in the former case, was not, as
this court has often adjudged, interstate commerce, while
the business of the Telegraph Company was primarily and
mainly that of interstate commerce. A decision, such as was
rendered in the *Prewitt case*, that a State could, with or with-
out reason and without violating the Constitution, revoke its
permit to a foreign *insurance* company to do business of a
domestic character within its limits, cannot be cited as au-
thority for the proposition, upon which the Kansas statute
rests, that a State may prescribe such regulations as to cor-
porations of other States engaged in both interstate and local
business, as will require them, as a condition of their doing
local business, that they shall contribute a given amount,
out of their capital stock, representing all its business, inter-
state and domestic, wherever done, and all its property,
wherever located, in or outside of the State, for the support
of the State's schools. The *Prewitt case* by no means recog-
nized any uncontrollable power in a State to prohibit all
foreign corporations, in whatever business engaged, from
doing business within its limits. On the contrary, this court
said in that very case that "a State has the right to prohibit
a foreign corporation from doing business within its borders,
*unless such prohibition is so conditioned as to violate some
provision of the Federal Constitution*"—citing various ad-
judged authorities, among them the case of *Hooper* v. *Cali-
fornia*, 155 U. S. 648, 652, 653. In the latter case the court
recognized, as long settled, the general principle that the
right of a foreign corporation to engage in business within
the State depended solely on the will of such State. But it
took especial care to say that the interstate business of a
foreign corporation was a business of an exceptional character
and was protected by the Constitution against interference by
state authority. The cases referred to in support of that view
are the same as those hereinbefore cited in this opinion. If
it be true that the statute of Kansas, by its necessary opera-
tion, imposes a burden on the interstate business of the Tele-

graph Company, and subjects its property and business outside of that State to taxation, then the constitutional validity of the statute, in the particulars adverted to, may be here adjudged without any reference whatever to the judgment in the *Prewitt case* and without reëxamining the grounds upon which that judgment rested. The court did not intend by its judgment in the *Prewitt case* to recognize the right of Kentucky, by any regulation as to foreign insurance companies, to burden interstate commerce or to tax property located and used without its limits. It could not have done so without overruling numerous decisions of this court on that subject. On the contrary, as we have seen, the court in that case distinctly recognized the principle that a State could not make any prohibition whatever as to a corporation doing business within its limits that would be in violation of the Federal Constitution. In respect of the point actually decided in it we leave the *Prewitt case* and the objections urged against the doctrine it announces wholly on one side and go no further now than is indicated in this opinion.

It results that a decree of ouster, such as the State asks, could not be granted without recognizing the validity of and giving effect to the unconstitutional requirement that the Telegraph Company, as a *condition* of its being allowed to do intrastate business in Kansas, should pay into the state school fund a given per cent of its authorized capital in the form of a fee based, as in effect it is, on all its property, business and interests everywhere, including both its interstate and intrastate business and property. Such a decree is asked on the ground that the company has refused to pay such fee. The state court ought to have refused the affirmative relief asked and dismissed the petition upon the ground that the condition sought to be enforced by a decree of ouster was in violation of the commerce and due process clauses of the Constitution and of the company's rights under that instrument. The right of the Telegraph Company to continue the transaction of local business in Kansas could not be made to

depend upon its submission to a condition prescribed by that State, which was hostile both to the letter and spirit of the Constitution. The company was not bound, under any circumstances, to surrender its constitutional exemption from state taxation, direct or indirect, in respect of its interstate business and its property outside of the State, any more than it would have been bound to surrender any other right secured by the National Constitution.

There are other aspects of the case involving constitutional questions that might be considered, and which, it is contended, would lead to the same conclusion as is herein indicated. But it is unnecessary to pass on any of the grounds urged by the Telegraph Company in its defense other than those made the basis of the decision now rendered. In order to dispose of this case we need not now go further than to hold, as we do, that for the reasons stated the State was not entitled to the aid of the court in this case; that the affirmative relief asked by it could not have been granted without practically compelling the Telegraph Company as a condition of its doing local business in Kansas that it should surrender rights belonging to it under the Constitution of the United States and secured by that instrument against hostile state action; that any such condition was unconstitutional and void; and that the right of the Telegraph Company to continue doing business in Kansas is not and cannot be affected by that condition.

Mr. Justice Moody heard the argument in this case, participated in its decision, and approves the opinion of the court.

*The judgment of the Supreme Court of Kansas is reversed and the cause remanded for such proceedings as may be consistent with this opinion.*

*Reversed.*

Mr. Justice White concurring.

It is shown that the Telegraph Company, many years ago, went into the State of Kansas, constructed its lines, established

its offices, etc., and has since been engaged in business, both interstate and local.   It is not disputed that there was no law in the State forbidding the company from doing as it did. From this it results that the corporation went into the State, constructed its plant, and carried on its business, on the implied invitation, or at least with the tacit consent of the State.   No one questions that the tax which is here in dispute, imposed by the law of Kansas upon the corporation, is repugnant to the Constitution of the United States because wanting in due process, and that it is therefore confiscatory in character.   The tax being thus conceded to be inherently vicious, there is, of course, no attempt to sustain its validity on its intrinsic merits.   The sole contention is that although the tax is void, the Telegraph Company may not invoke the protection of the Constitution of the United States, because it is in a position where it is not entitled to avail itself of the fundamental safeguards which it was the purpose of the Constitution to secure to all.   The reasoning by which it is thus sought to sustain the right of the State to exert a power prohibited by the Constitution of the United States, and to outlaw the corporation by depriving it of the protection afforded by that instrument, is this: The State, it is insisted, has the right to prevent a foreign corporation from coming into its jurisdiction and engaging there in local business, and this power, in the nature of things, must include the right to affix such conditions to the privilege of coming in as the State chooses to impose.   Under these circumstances, the argument proceeds, it becomes immaterial to consider the character of the condition annexed by the State to the enjoyment of the right to come in, since, although such conditions be repugnant to the Constitution of the United States and destructive of the most obvious and sacred rights, as the condition only becomes operative provided the corporation elects to come in, therefore the condition is not obligatory but is voluntarily assented to by the corporation and, hence may not be by it questioned.   But even if, for the sake of the argument only,

the general correctness of the proposition be conceded, it has
no application to the case here presented. Such is the case,
since this cause is concerned, not with the power of the State
to prevent a corporation from coming in for the purpose of
doing local business and to attach conditions to the privilege
of so coming in, but involves the right of the State to con-
fiscate the property of the corporation already within the
State and which has been there for years, devoted to the doing
of local business as the result of the implied invitation or
tacit consent of the State arising from its failure to forbid
or to regulate the coming in. In other words, this case in-
volves determining, not how far a State may arbitrarily
exclude, but to what extent, after allowing a corporation to
come in and acquire property, a State may take its property
within the State without compensation upon the theory that
the corporation is not in the State and has no property right
therein which is not subject to confiscation. The difference
between the premise upon which the proposition contended
for rests and the situation here presented seems to me self-
evident. I say this because my mind fails to perceive how
the doctrine of election or voluntary assumption of an un-
constitutional burden can have any possible application to a
case like this. Let me illustrate. The Telegraph Company
has expended in the State large sums of money, adequate
for the purpose of enabling it to do both local and interstate
business. The investment is there, and its magnitude, it is
fair to assume, is, in part, a resultant of the requirements of
the local business. The continued beneficial existence of the
investment depends upon the right to use the property for the
purpose for which it was acquired, that is, for both interstate
and local business. The state law takes the property, or what
is equivalent thereto, imposes an unconstitutional and con-
fiscatory burden, upon the condition that such burden be
discharged or the local business be abandoned. What possible
election can there be? The property is in the State. It has
been invested therein for the very purpose of doing local as

well as other business. If the unconstitutional burden be not assumed, local business must cease, and hence the property established for the purpose of doing the local business becomes worthless and is in effect confiscated. If, on the other hand, the unconstitutional burden be borne, a like result takes place.

Nor, I submit, is there force in the suggestion that under the facts here disclosed the company cannot be heard to complain, because, as it was in the State without express authority, it must be assumed to have gone into the State and made its investment subject to the exertion by the State of its authority. I concede the proposition to be sound in so far as it includes the right of the State to exert its lawful powers. That is to say, I concede that the corporation in going in and investing its property within the State did so subject to the right of the State to exert, as to the property thus in the State, all lawful powers which might be called into play as to property so situated, of the character of that under consideration. But I cannot assent to the correctness of the contention in so far as it asserts that the State may suffer a corporation to come into its borders, invest in property therein, and then, after having allowed, by acquiescence or implied invitation, such a situation to arise, the State may treat the corporation as if it had never come in and its property within the State as if it were wholly out of the State, and despoil the corporation of its rights and property upon such false assumption.

It is to be observed that the view taken by me does not deprive the State of power to exert its authority over the corporation and its property in the amplest way subject to constitutional limitations. It simply prevents the State from driving out the corporation which is in the State by imposing upon it arbitrary and unconstitutional conditions, when upon no possible theory could the right to exact them exist, except upon the assumption that the corporation is not in the State, and that the illegal exactions are the price of the privilege of allowing it to come in.

Resting, as I do, my concurrence in the decree in this case upon the grounds just previously stated, it becomes unnecessary for me to say anything concerning the wider ground upon which the opinion of the court proceeds, but I do not wish to be understood as dissenting in any respect from the fundamental principle which the opinion of the court embodies and applies.

MR. JUSTICE HOLMES, with whom concurred THE CHIEF JUSTICE and MR. JUSTICE MCKENNA, dissenting.

I think that the judgment of the Supreme Court of Kansas was right, and it will not take me long to give my reasons. I assume that a State cannot tax a corporation on commerce carried on by it with another State, or on property outside the jurisdiction of the taxing State, and I assume further that for that reason a tax on or measured by the value of the total stock of a corporation like the Western Union Telegraph Company is void. But I also assume that it is not intended to deny or overrule what has been regarded as unquestionable since *Bank of Augusta* v. *Earle*, 13 Pet. 519, that as to foreign corporations seeking to do business wholly within a State, that State is the master, and may prohibit or tax such business at will. *Security Mutual Life Ins. Co.* v. *Prewitt*, 202 U. S. 246, 249. *Waters-Pierce Oil Co.* v. *Texas*, 177 U. S. 28. *Paul* v. *Virginia*, 8 Wall. 168. I make the same assumption as to what has been decided twice at least since I have sat on this Bench, that the right to prohibit, regulate or tax foreign corporations in respect of business done wholly within a State is not taken away by the fact that they also are engaged there in commerce among the States. *Pullman Co.* v. *Adams*, 189 U. S. 420. *Allen* v. *Pullman's Palace Car Co.*, 191 U. S. 171.

If it should be said that the corporation had a right to enter the State for commerce with other States, and being there had the same right to use its property as others, I reply that this begs the question, if the premises be granted. If the corporation has the right to enter for one purpose and the State has

a right to exclude its entry for another, the two rights can co-exist.  To say that the disappearance of the latter is an incident of the ownership of property there is to declare that what is allowed only for a limited purpose must have general results. I think it more logical and more true to the scheme of the Union to recognize that what comes in only for a special purpose can claim constitutional protection only in its use for that purpose and for nothing else.  That, at all events, has been decided in the cases to which I have referred.

Now what has Kansas done?  She has not undertaken to tax the Western Union.  She has not attempted to impose an absolute liability for a single dollar.  She simply has said to the company that if it wants to do local business it must pay a certain sum of money, just as Mississippi said to the Pullman Company that if it wanted to carry on local traffic it must pay a certain sum.  It does not matter if the sum is extravagant. Even in the law the whole generally includes its parts.  If the State may prohibit, it may prohibit with the privilege of avoiding the prohibition in a certain way.  I hardly can suppose that the provision is made any the worse by giving a bad reason for it or by calling it by a bad name.  I quite agree that we must look through form to substance.  The whole matter is left in the Western Union's hands.  If the license fee is more than the local business will bear it can stop that business and avoid the fee.  Whether economically wise or not, I am far from thinking that the charge is inherently vicious or bad.— If the imposition were absolute, or if the attempt were to oust the corporation from the State if it did not pay, the arguments that prevail would be apposite.  But the State seeks only to oust the corporation from that part of its business that the corporation has no right to do unless the State gives leave.

Of course the suggestion on the other side is that this is an attempt by indirection to break the taboo on the Telegraph Company's business with other States.  The local and the interstate business may be necessary each to the other to make the whole pay.  Or the Telegraph Company might carry on the

54    OCTOBER TERM, 1909.

Holmes, J., The Chief Justice and McKenna, J., dissenting.    216 U. S.

local business at a loss, for the sake of popularity or other in-
direct sources of gain. In the last case the fee would come out
of earnings that the State has no right to touch. But these
considerations do not reach their aim. To deny the right of
Kansas to do as it chooses with the local business is to require
the local business to help to sustain that between the States.
If the latter does not pay alone that is no reason for cutting
down powers that up to this time the States always have pos-
sessed. If the Telegraph Company chooses to pay the fee out of
its other earnings that is its affair. It is master of the situa-
tion and can stop if it sees fit. Exactly this argument was
pressed in *Pullman Co.* v. *Adams,* 189 U. S. 420, 421, and was
rejected without dissent. See *Ashley* v. *Ryan,* 153 U. S. 436,
444.

What I have said shows, I think, the fallacy involved in
talking about unconstitutional conditions. Of course, if the
condition was the making of a contract contrary to the policy
of the Constitution of the United States, the contract would
be void. That was all that was decided in *Southern Pacific Co.*
v. *Denton,* 146 U. S. 202. But it does not follow that, if keep-
ing the contract was made a condition of staying in the State,
the condition would be void. I confess my inability to under-
stand how a condition can be unconstitutional when attached
to a matter over which a State has absolute arbitrary power.
This court was equally unable to understand it in *Horn Silver
Mining Co.* v. *New York,* 143 U. S. 305, 315. In that case it
was said: "Having the absolute power of excluding the foreign
corporation the State may, of course, impose such conditions
upon permitting the corporation to do business within its
limits as it may judge expedient; and it may make the grant
or privilege dependent upon the payment of a specific license
tax, or a sum proportioned to the amount of its capital."

The consequence is the measure of the condition. When the
only consequence of a breach is a result that the State may
bring about directly in the first place, the condition cannot be
unconstitutional. If after this decision the State of Kansas,

without giving any reason, sees fit simply to prohibit the Western Union Telegraph Company from doing any more local business there or from doing local business until it has paid $20,100, I shall be curious to see upon what ground that legislation will be assailed. I am aware that the battle has raged with varying fortunes over this matter of unconstitutional conditions, but it appears to me ground for regret that the court so soon should abandon its latest decision, *Security Mut. Life Ins. Co.* v. *Prewitt,* 202 U. S. 246.

Finally, in the absence of contract, the power of the State is not affected by the fact that the corporation concerned already is in the State or even has been there for some time. *Waters-Pierce Oil Co.* v. *Texas,* 177 U. S. 28. *National Council of the Junior Order of United American Mechanics* v. *State Council of Virginia,* 203 U. S. 151, 163. Whatever the corporation may do or acquire there is infected with the original weakness of dependence upon the will of the State. This is a general principle illustrated by many cases. Thus a water company cannot take away the power of a city to establish rates by making contracts with its customers. *Knoxville Water Co.* v. *Knoxville,* 189 U. S. 434, 438. Private individuals cannot cut down the police power by their arrangements together. *Manigault* v. *Springs,* 199 U. S. 473, 480. A city cannot limit the power of the legislature over property by making a lease. *Browne* v. *Turner,* 176 Massachusetts, 9, 15. Or, to pass at once to the most recent and most conspicuous example, the power of Congress to regulate a commerce among the States cannot be affected by the acquisition of property or growth of values dependent upon the continuance of its assent. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 405, 406. In that case an enormous amount of property had been built up under direct encouragement from the States in which it was situated, and was saved from destruction only by the restricted meaning given to the act of Congress. The unrestricted power of Congress was affirmed in strong terms. See also *Union Bridge Co.* v. *United States,*

204 U. S. 364, 394. In *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305, the corporation showed by its answer that it had employed part of its capital in manufacturing in New York. It had got into the State and was at work there, yet it was held liable to pay a percentage of its entire capital, although the greater part was outside the State.—But furthermore it is a short answer to this part of the argument that in the present case, according to decisions relied upon by the majority, the State could not have prevented the entry of the corporation, because it entered for the purpose of commerce with other States.

The CHIEF JUSTICE and MR. JUSTICE McKENNA concur in this dissent.

The late MR. JUSTICE PECKHAM took part in the consideration of the case and agreed with the minority.