# MEMORANDA

CORNELIUS GALLAGHER, Plaintiff, v. EDWARD S. PEROT
and MINNIE B. JACKSON, as Executrix of GEORGE J.
JACKSON, Deceased, Defendants.*

(Supreme Court, Nassau Special Term, December, 1918.)

*Contract — purchase of corporate stock for joint benefit — account-
ing for share of profits on resale of stock to third party.*

ACTION for the construction of a contract and for an
accounting.

Macklin, Brown & Purdy, for plaintiff.

Johnson & Galston, for defendant Edward S. Perot.

Duer, Strong & Whitehead, for defendant Minnie B.
Jackson, as executrix, etc.

FABER, J. The purpose of this action is to procure
an adjudication that a certain contract made by the
defendants on July 16, 1906, to purchase all the right,
title and interest of one James P. McQuaide in 1,250
shares of stock of the National Conduit and Cable
Company, although in form for the sole benefit of the
defendants, was in reality for the joint benefit of the

---

* Affirmed by the Appellate Division, Second Department, April
9, 1920, without opinion.— [REPR.

defendants and the plaintiff, and that the defendants be required to account to the plaintiff for his share of the net profits arising from a resale of the same shares of stock to a third party.

For a considerable number of years prior to April 1, 1903, the plaintiff and the defendants and one James P. McQuaide were the owners of the entire capital stock of the National Conduit and Cable Company, a domestic corporation. The capital stock of said corporation was divided into 5,000 shares of the par value of $100 each, and each of the parties above named owned one-fourth of such capital stock, or 1,250 shares.

On April 1, 1903, McQuaide, who was at that time receiving a salary of $10,000 a year as treasurer of the corporation, finding himself in financial difficulties, entered into a trust agreement in writing with the defendant Perot, whereby he transferred to said defendant as trustee his 1,250 shares of stock in the corporation, and the right to receive the dividends thereon, and whereby Perot, as trustee, agreed to pay certain debts of McQuaide aggregating $26,173.15, and to pay to McQuaide's wife for the benefit of herself and children the sum of $6,400 per annum, and to pay the balance of the dividends on the stock, if any, to McQuaide or his appointees. About the same time, McQuaide was compelled to resign his position as treasurer of the company, but continued to draw his salary until July, 1906.

On July 16, 1906, McQuaide entered into a further agreement in writing with the defendants, whereby he agreed to sell to the defendants the 1,250 shares of stock above mentioned, subject to the trust theretofore created in favor of his wife and children, upon condition that said defendants pay certain of his debts aggregating $26,171.14, and pay him the sum of $10,000 per year, in equal monthly installments, for a period of five years from the date of the agreement, and also pay $250,000 in cash on July 16, 1911. At

intervals after the execution of this agreement advance payments of considerable amounts were made to McQuaide, at his request, on account of the principal sum of $250,000, which by the terms of the agreement was to have been paid on July 16, 1911, and on each occasion when such advance payment was made a supplemental agreement in writing was executed extending the time for payment of the balance of such principal sum, and also the period during which the annual payments to McQuaide were to run, and reducing the amount of such annual payments. The advance payments so made between January 29, 1909, and April 8, 1915, aggregated $154,205, and by the final supplemental agreement, executed on the date last mentioned, the time for payment of the balance of the principal sum, then amounting to $95,750, was extended to July 16, 1921, and the amount of the annual payment to McQuaide was fixed at $3,830.

At the date of the original trust agreement of 1903, McQuaide executed a formal transfer of his 1,250 shares of stock, to the defendant Perot, and at the same time a new certificate for said shares of stock was issued to Perot as trustee, and Perot continued to hold the legal title to said shares as trustee after the agreement of July 16, 1906, and until April 16, 1917. On the date last mentioned all the stock of the corporation, together with the stock of certain subsidiary corporations owned by the plaintiff and the defendants was sold and transferred to one Hugh K. Pritchett for the sum of $8,000,000 in cash.

McQuaide died some time in the year 1916, the exact date not appearing from the evidence. The final payments under the contract for purchase of the stock were made out of the proceeds of the sale to Pritchett.

Notwithstanding the fact that the written agreement of July 16, 1906, provided on its face for a sale of the McQuaide stock to the defendants Perot and

Jackson, the plaintiff contends that the real under-standing and agreement between the defendants and himself was that the stock was to be purchased by the corporation for their joint benefit, and that a consider-able portion of the money paid to McQuaide under the agreement for purchase of the stock was money of the corporation and not of the defendant and that by reason thereof he is entitled to a share of the net profits realized from the subsequent sale of the stock to Pritchett. The defendants, on the other hand, con-tend that they never agreed with the plaintiff to pur-chase the stock in question for his and their joint benefit or for the benefit of the corporation, but that the purchase was solely for their own benefit, and that they are entitled to all of the profits arising from the resale of the stock.

In support of his contention that there was an agree-ment between himself and the defendants that the McQuaide stock should be purchased for their joint benefit the plaintiff testified in regard to a conversa-tion which he claims he had with the defendant Jackson in the company's office, just before July, 1906, as fol-lows: " I came in one day, and Mr. Jackson told me that Mr. McQuaide was down in the street trying to sell his stock. And he said, ' Don't you think the Com-pany better purchase it? ' ' Well,' I said, ' I suppose so; I don't know.' Then he says, ' You know we don't want any outsiders coming in.' He said, ' I think it would be a good thing for the Company to purchase it.' I said, 'All right.' " He also testified that three or four days later Jackson came in again and said that the company had purchased McQuaide's stock for $250,000, and the payment of McQuaide's debts and $10,000 cash, and that he replied "All right." The plaintiff's testimony as to these conversations is con-tradicted by the defendants, who deny absolutely that any such conversations ever took place, but a careful consideration of all the evidence in the case,

together with my observation of the bearing of the respective witnesses on the stand, leads me to accept the testimony of the plaintiff as true. Standing alone, the plaintiff's testimony as to his conversations with Jackson would probably be insufficient to show a binding contract for the joint purchase of the stock, and consequently would not entitle the plaintiff to the relief which he is now seeking. There is, however, another fact established by the evidence, which, to my mind, not only corroborates the plaintiff's testimony as to the conversations in question, but which taken in connection with the conversations established the plaintiff's right to an accounting. The fact to which I refer is that the purchase of McQuaide stock under the agreement of July 16, 1906, was financed to a very considerable extent out of the funds of the corporation. The evidence shows that the payments for the stock were made from four sources. *First.* The dividends on the stock itself, which during the period involved in this action amounted to $3,750 a quarter or $15,000 a year. *Second.* The sum of $833.33 per month which was paid by the corporation to the defendant Perot, as trustee, every month from July, 1906, to and including April, 1917, and which was in turn applied by Perot to payments under the contract. *Third.* A fund created by the defendant by the deposit of $850 per month in the Guaranty Trust Company, in an account standing in their names, which account was opened on July 30, 1906. *Fourth.* A portion of the proceeds of the sale of April 16, 1917, to Pritchett. So far as the dividends upon the McQuaide stock are concerned, the fact that they were used in financing the contract of purchase is of no significance upon the question here at issue, nor can any significance be attached to the use of a portion of the proceeds of the sale to Pritchett in making the final payments under the agreement. The situation, however, with regard to the payment of $833.33 a month out

46

of the treasury of the company is different. This monthly payment did not represent dividends on the McQuaide stock. It was an application of the corporate funds to the purchase of the stock, and to the extent at least that the corporate funds were so applied, the corporation if regarded as a separate entity would be entitled to an accounting from the defendants of the profits arising from the subsequent sale of the stock to Pritchett. I think, however, that under the circumstances disclosed by the evidence the corporate entity may and should be disregarded, and the plaintiff and the defendant treated as virtually partners, thus entitling the plaintiff to an accounting from the defendants. While stockholders' and directors' meetings were held from time to time to comply with the law, the evidence warrants the conclusion that the affairs of the company from its inception were managed on a partnership rather than a corporate basis. Prior to April 1, 1903, all of the capital stock was held by the plaintiff and the defendants and McQuaide in equal shares, and the only change in such stock ownership after that date and down to the final sale of the stock to Pritchett was that subsequent to 1903 the legal title to the McQuaide stock was vested in the defendant Perot as trustee. It is conceded that the corporation throughout the entire period involved in this suit, was not only solvent but extremely prosperous, and, consequently, there are no rights of creditors to be taken into account. All of the stock of the corporation has now been sold and the only persons interested in the proceeds of the sale, in any view of the case, are the parties to this action. McQuaide's estate has no interest therein, all of the payments called for by the agreement of July 16, 1906, having been made. Under these circumstances I think that a court of equity has power to disregard the corporate entity and hold the defendants liable to account to the plaintiff directly,

instead of to the corporation. *Goss & Co.* v. *Goss*, 147 App. Div. 703; *Quaid* v. *Ratkowsky*, 183 id. 428; *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1.

The defendants attempt to explain the payment of $833.33 per month or $10,000 a year to Perot as trustee in several different ways. Their first explanation has reference to certain resolutions alleged to have been adopted by stockholders and directors of the company at a meeting held on March 11, 1907. The resolution alleged to have been adopted by the stockholders on that date, together with the preamble thereto, reads as follows: " The Secretary announced that all the right, title and interest of James P. McQuaide in and to twelve hundred fifty (1250) shares of capital stock of the Company had been sold, transferred and conveyed to Edward S. Perot and George J. Jackson; and it was further announced that one of the objects of this purchase was directly to benefit the Company by securing the payment of many of Mr. McQuaide's obligations, and having it generally understood that he was in no way any longer connected with the Company, and it having been the policy of the Company at various times in the past to pay the owner of the said shares Ten thousand ($10,000) dollars per year as salary, on motion, duly made and seconded, it was unanimously *resolved* that the Board of Directors of the Company be and they hereby are authorized to pay to Edward S. Perot and George J. Jackson, the present owners of the stock formerly owned by James P. McQuaide, each the sum of $5,000 annually." The resolution alleged to have been adopted by the directors on the same date reads as follows: " *Resolved* that the Company pay to Edward S. Perot and George J. Jackson, as purchasers of the stock of the Company, formerly owned by James P. McQuaide Five thousand ($5,000) dollars each annually in accordance with the resolu-

tion adopted this day by the stockholders of the Company.''

It will be observed that the preamble to the first resolution states that one of the objects of the purchase of the McQuaide stock was directly to benefit the company by securing the payment of many of McQuaide's obligations and having it generally understood that he was no longer connected with the company. At the same time when the agreement to purchase was made, McQuaide was indebted to the company in the sum of $19,838.25, as shown by the schedule of his debts annexed to the agreement, while his total indebtedness to other creditors amounted to about $6,300. I do not see how the payment of McQuaide's debts could be said to benefit the corporation if the corporation itself was to be required to pay them, without receiving anything in return. Neither can I understand how a private contract for the sale of McQuaide's stock to the defendants could have any effect on the general or public understanding regarding McQuaide's connection with the company. Finally it should be borne in mind that while McQuaide's total indebtedness was only about $26,000, the resolutions provided for the payment by the corporation of the sum of $10,000 a year for an indefinite period, and the payments actually made to Perot as trustee continued for more than ten years and aggregated over $100,000. For reasons hereinafter stated, I have concluded that the plaintiff never consented to these alleged resolutions in the form in which they now appear in the minute book of the corporation, but whether he so consented or not, it is at least clear that the resolutions themselves afford no adequate explanation of the payments which were made to Perot as trustee, and which he in turn applied to the purchase of the stock.

Another explanation offered by the defendants is that after McQuaide's retirement as treasurer of the company the performance of his duties as treasurer

fell upon them, and that it was to compensate them for the performance of these duties that they were to be paid the $10,000 per year theretofore paid to McQuaide as salary. I am not impressed with this explanation of the transaction. The minutes of the corporation, which are in evidence, show that McQuaide resigned as treasurer of the corporation on April 9, 1903, and that at a directors' meeting held on that day his resignation was accepted and it was resolved that an assistant treasurer be appointed from outside the directory of the company to attend to all the duties of the treasurer, and that one Thomas F. O'Connor was appointed as such assistant treasurer. The minutes further show that at a directors' meeting held on February 20, 1906, the defendant Jackson was elected secretary and treasurer of the corporation, and Thomas F. O'Connor was appointed assistant treasurer, and that at the meeting of March 11, 1907, when the resolutions here in question are alleged to have been passed, Jackson and O'Connor were respectively re-elected and reappointed treasurer and assistant treasurer. It is certainly somewhat strange that the corporation should have gone through the formalities of creating the office of assistant treasurer and appointing O'Connor to that position, presumably at a salary, and electing the defendant Jackson as treasurer, if the duties of the office were in fact being performed by Perot and Jackson jointly. The resolution of March 11, 1907, does not purport to authorize the payment of $10,000 per year to Perot and Jackson as salary, nor does the preamble to such resolution contain any recital that Perot and Jackson were performing the duties of the office of treasurer formerly held by McQuaide. While the resolution provided for the payment of $5,000 per year to Perot, and of the same amount to Jackson, the evidence shows conclusively that the whole sum of $10,000 per year was paid to Perot as trustee.

A third explanation offered by the defendants is that the payments to Perot as trustee were really in the nature of advances, to be repaid to the company. In support of this, they call attention to the fact that the ledger account entitled " Edward S. Perot, Trustee " in which the payments were entered, contains semi-annual charges of interest against Perot as trustee, and also to the fact that when said account was closed, on December 29, 1908, it showed no balance owing by Perot as trustee to the company. This explanation advanced by the defendants is, of course, entirely inconsistent with their other explanation that the payments to Perot were payments of salary. If the payments represented salary, interest would not have been charged thereon nor could there have been any question of repayment. As a matter of fact the amounts paid to Perot as trustee were never repaid to the company. It is clear from the evidence that the monthly entries of $833.33 on the credit side of the trustee account did not represent payments actually made by Perot to the corporation, and consequently that the account eventually balanced is of no significance. After the closing of the trustee account the corporation continued to make the monthly payments to Perot, as trustee, charging the same in its general expense account, and there is no claim that any of these amounts were ever repaid to the company.

Upon consideration of all of the evidence in the case I have concluded that the real situation in regard to the purchase of the McQuaide stock was as follows: At the time when the agreement for the purchase of the stock was being negotiated between McQuaide and the defendants, the latter realized that the annual dividend on the stock, amounting to $15,000, would not be sufficient to finance the purchase, and that it would be necessary to resort, for the purpose, to the salary of $10,000 a year which the corporation had theretofore been paying to McQuaide. To secure the plain-

tiff's acquiescence in the application of this amount to the purchase of the stock, the defendants represented to the plaintiff that the purchase was to be made by the corporation, for his benefit as well as theirs, and the plaintiff approved of the purchase on that basis, and also approved of the continuance of the annual payment of $10,000, theretofore made to McQuaide. In further execution of the same plan, and to lend an appearance of regularity to the transaction in case it was ever questioned, the defendants caused the peculiar resolution of March 11, 1907, to be prepared and entered in the corporate minutes. The plaintiff denies all knowledge of these resolutions, and having regard to the general manner in which the business of the corporation was conducted, I believe that his testimony on this point is true. It is quite significant that notwithstanding the alleged adoption of such resolutions, providing for the payment of $5,000 a year each to Perot and Jackson, the payments actually made were to Perot as trustee, at the rate of $10,000 per year. These payments to Perot as trustee were entirely consisent with the theory that the corporation was the purchaser of the stock, whereas payments to Perot and Jackson individually might have aroused the plaintiff's suspicions. It may seem strange that the defendants were able to deceive the plaintiff for so long a period as to their real intention with regard to the purchase of the stock, but I think that this is explained by the relations of the parties and the manner in which the business of the corporation was carried on. The plaintiff was a man past the prime of life. He was considerably older than either of the defendants, and their inferior in shrewdness and business ability. During the period here in question he did not take a very active part in the office business of the company. The head bookkeeper of the corporation and his assistants were entirely under the control of the defendants, and the same seems to have been true of the attorney

who represented the corporation. About all that the plaintiff did in the business was to sign checks and other papers when requested by the defendants. The plaintiff testified that he and the defendants were very friendly; that they were like brothers; that he supposed the defendants were going to treat him right, and had full confidence in them.

The defendants may have felt, with some reason, that the success of the corporation was due more to their efforts than to the efforts of the plaintiff, and may have believed that by reason of this fact they were entitled to all of the profits arising from the purchase of the McQuaide stock. Their belief in that regard, however, cannot alter the legal situation arising from the appropriation of the corporate funds to such purchase. Inasmuch as they represented to the plaintiff that the stock was to be purchased for the joint benefit of all, and as the purchase was in fact so largely financed by the corporation, I conclude that the only way in which justice can be arrived at between the parties is by rendering an interlocutory judgment in favor of the plaintiff for an accounting. On such accounting the exact amount contributed by the defendants to the purchase of the stock can be determined, and they will, of course, be entitled to credit for that amount. Further proof can also be taken as to whether the Hastings Home Company and the National Brass and Copper Tube Company had such independent existence as to justify any division or apportionment of the amount paid by Pritchett for the stock of those corporations and the National Conduit and Cable Company, a point which is not entirely clear upon the present evidence.

Ordered accordingly.