**PHILLY'S, the Original Philadelphia Cheese Steak, Inc., Plaintiff-Appellant,**

v.

**Jane M. BYRNE, as Mayor and as Liquor Control Commissioner of the City of Chicago, Defendant-Appellee,**

**and**

**Illinois Liquor Control Commission, Defendant-Intervenor-Appellee.**

**LOS FARRALLONES, INC., an Illinois Corporation, Jorge Aristizabal, and Nick Andrews, Plaintiffs-Appellants,**

v.

**Jane M. BYRNE, as Mayor and as Liquor Control Commissioner of the City of Chicago, Defendant-Appellee,**

**and**

**Illinois Liquor Control Commission, Defendant-Intervenor-Appellee.**

Nos. 83–1945, 83–1946.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 3, 1984.

Decided April 19, 1984.

As Amended on Denial of Rehearing May 29, 1984.

Richard L. Cantor, Chicago, Ill., for plaintiffs-appellants.

Lynn K. Mitchell, Asst. Corp. Counsel, for defendant-appellee.

Kathleen Lien, Asst. Atty. Gen., Chicago, Ill., for defendant-intervenor-appellee.

Before WOOD, ESCHBACH and POSNER, Circuit Judges.

POSNER, Circuit Judge.

These appeals are from the dismissal, on the defendants' motion for summary judgment, of a suit under section 1 of the Civil Rights Act of 1871 (now 42 U.S.C. § 1983) against Chicago's (former) mayor and liquor control commissioner. The suit was for damages and injunctive relief, and alleged that the operation of Illinois' local-option liquor law, which so far as relevant here allows the voters in a precinct to vote the precinct "dry," deprived the plaintiffs of property without due process of law, in violation of the Fourteenth Amendment. Other constitutional violations were also alleged, but these allegations, to the extent they have any substance at all, merely ring changes on the due process theme.

Article IX of the Illinois Liquor Control Act, Ill.Rev.Stat.1981, ch. 43, ¶¶ 166 *et seq.*, provides that upon the filing, at least 90 days before the next regularly scheduled general election, of a petition signed by 25 percent or more of a precinct's registered voters, the question whether to ban the retail sale of alcoholic beverages in the precinct shall be placed on the ballot at the election. (Except in cities of more than 200,000 people, the electoral unit is the entire city, town, or village, rather than the individual precinct. See ¶ 167.) If the vote is to ban, any license to sell liquor in the precinct lapses automatically 30 days after the election. The appellants in No. 83–1946 (*Los Farrallones*), who own a restaurant in Chicago, lost their liquor license as a result of such a referendum; the vote was 188 to 58. In No. 83–1945 (*Philly's*), the appellant had not yet been issued a license when the referendum in its precinct was held, although its application for a license had been approved. The vote in this precinct was 152 to 71 to ban the sale of liquor.

In *Rippey v. Texas*, 193 U.S. 504, 24 S.Ct. 516, 48 L.Ed. 767 (1904), the Supreme Court, in an opinion by Justice Holmes, rejected a claim that an Alabama law similar to the local-option provision in the Illinois Liquor Control Act denied due process of law by subjecting the liquor seller's property rights to the whim of the electorate. *Rippey* has never been overruled; and it is cited with approval in several modern cases. See *Salsburg v. Maryland*, 346 U.S. 545, 552 n. 7, 74 S.Ct. 280, 284 n. 7, 98 L.Ed. 281 (1954); *Griffin v. Board of Supervisors*, 322 F.2d 332, 342 and n. 25 (4th Cir.1963), rev'd, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Graham v. State*, 45 Ala.App. 79, 224 So.2d 905 (1969), app. dismissed, 396 U.S. 279, 90 S.Ct. 567, 24 L.Ed.2d 466 (1970); *McDonald v. Brewer*, 295 F.Supp. 1135, 1139 (N.D.Ala.1968); *Hall v. St. Helena Parish School Bd.*, 197 F.Supp. 649, 658 (E.D.La.1961) (three-judge court) (per curiam), aff'd mem., 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962). Yet it would be risky to rest decision on *Rippey* alone, especially when the only modern cases upholding local-option laws against due process challenges (Illinois cases by the way) do so, as we shall see, on the ground rejected in *Reed v. Village of Shorewood*, 704 F.2d 943, 948–49 (7th Cir. 1983), that a liquor license is a privilege and not a right. See *Seals v. City of Chicago*, 93 Ill.App.3d 678, 680, 49 Ill.Dec. 153, 155, 417 N.E.2d 843, 845 (1981); *Duncan v. Marcin*, 82 Ill.App.3d 963, 967–68, 38 Ill.Dec. 422, 425, 403 N.E.2d 653, 656 (1980); *Malito v. Marcin*, 14 Ill.App.3d 658, 662, 303 N.E.2d 262, 265 (1973), leave to appeal denied, 55 Ill.2d 602 (1974), app. dismissed, 417 U.S. 963, 94 S.Ct. 3165, 41 L.Ed.2d 1135 (1974). A number of modern cases, however, uphold this kind of law against other challenges. Besides *Griffin*, *Graham*, and *McDonald*, *supra*, see *Two Guys from Harrison, Inc. v. Furman*, 32 N.J. 199, 223–30, 160 A.2d 265, 280–81 (1960), and *Alkire v. Cashman*, 350 F.Supp. 360, 365 (S.D.Ohio 1972), aff'd without opinion, 477 F.2d 598 (6th Cir. 1973).

The Supreme Court's opinion in *Rippey* depends entirely on the idea that the power

to prohibit implies an unlimited power to regulate short of prohibition, so that if the government is allowed by the Constitution to prohibit some activity (or deny some benefit) altogether it can attach any condition it wants to the conduct of the activity or the receipt of the benefit. This idea was a favorite of Holmes'. See, e.g., *Western Union Tel. Co. v. Kansas*, 216 U.S. 1, 53, 30 S.Ct. 190, 208, 54 L.Ed. 355 (1910) (dissenting opinion); *Commonwealth v. Davis*, 162 Mass. 510, 511–12, 39 N.E. 113 (1895); *McAuliffe v. Mayor*, 155 Mass. 216, 220, 29 N.E. 517 (1892) ("The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman"). But it is rejected in the modern cases, e.g., *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967); *Sherbert v. Verner*, 374 U.S. 398, 404–06, 83 S.Ct. 1790, 1794–95, 10 L.Ed.2d 965 (1967); *Speiser v. Randall*, 357 U.S. 513, 528–29, 78 S.Ct. 1332, 1343–44, 2 L.Ed.2d 1460 (1958); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982), at least in the unqualified form in which Holmes stated it in *Rippey* (as elsewhere): "the state has power to prohibit the sale of intoxicating liquors altogether, if it sees fit . . . and that being so it has power to prohibit it conditionally." 193 U.S. at 509, 24 S.Ct. at 517 (citation omitted).

■ No one believes any more that since the captain of a warship has no duty to let members of the general public on board to visit the ship when it is docked, he can decide to allow only Protestant visitors on board. But the idea that the greater governmental power includes the lesser may not be completely dead. There is a difference, as we shall see, between conditioning a benefit on the relinquishment of a substantive constitutional right, such as the right to the free exercise of religion or (in *McAuliffe*) to freedom of speech, and conditioning it on the acceptance of something less than the full range of possible procedural safeguards to protect its enjoyment. But the distinction is not made in *Rippey*.

*Rippey* also long predates the systematizing of due process analysis by *Board of*

*Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *Roth* provides the inspiration for the syllogism that the appellants press on us: a liquor license is a species of property within the meaning of the due process clause of the Fourteenth Amendment; they were deprived of this property by a referendum, which, as a naked appeal to majority rule, is the antithesis of a due process hearing; therefore their rights under the Fourteenth Amendment were violated.

■ We agree that there was a deprivation. In contrast to cases such as *Brown v. Brienen*, 722 F.2d 360, 366 (7th Cir.1983), where the existence of a state-court remedy for the injury of which the plaintiffs complained made it problematic whether there had been a deprivation within the meaning of the Fourteenth Amendment, the plaintiffs here have no remedy under state law for what has been done to them (assuming the referenda were not conducted in a fraudulent or otherwise unlawful manner), except to campaign for repeal in four years. But whether the deprivation was of property depends not only on whether an Illinois liquor license is property within the meaning of the Fourteenth Amendment, as held in *Reed v. Village of Shorewood, supra*, 704 F.2d at 948–49 (we shall not have to decide whether an approved application, as in No. 83–1946, creates a property right even before a license is issued), but also on the precise dimensions of the right. The defendants in *Reed* by a pattern of harassment drove the plaintiffs to give up their liquor license before its expiration. The present case concerns the date of expiration. Every liquor license in Illinois has a variable expiration date: either the date stamped on the license or the date on which the licensee is required to surrender the license because the precinct where the licensed premises are located has voted to go dry—whichever is earlier. Just as a tenant is not deprived of a property right when he is ejected from the premises at the expiration of his lease, so it can be argued that when a precinct votes itself dry any liquor licensees' property rights are extinguished by the terms of

the licenses. True, if a condition that limits a property right infringes a constitutional liberty—if, for example, liquor licenses expired by their terms when the licensee criticized the Liquor Control Commission—then, contrary to the rejected teaching of cases like *McAuliffe*, there would be a deprivation of which a licensee could complain under the Constitution, a deprivation of liberty (liberty of expression, in our example). But a referendum does not invade any constitutional liberty.

This is a powerful analysis—maybe too powerful. If Illinois provided that a liquor license could be taken away only for cause but cause as determined by the Liquor Control Commission without any notice to the licensee or opportunity for a hearing, the state could argue that this was simply a condition, not unlawful in itself (for there is no general constitutional requirement that government act only after notice and hearing), that limited the right. The holder of the right could complain only if the procedures the state prescribed, however meager, were not followed.

Although supported by Justice Rehnquist's plurality opinion in *Arnett v. Kennedy*, 416 U.S. 134, 155, 94 S.Ct. 1633, 1644, 40 L.Ed.2d 15 (1974), and vigorously argued in Easterbrook, *Substance and Due Process*, 1982 S.Ct.Rev. 85, 113, this approach is not yet law. See, e.g., *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432–36, 102 S.Ct. 1148, 1156–58, 71 L.Ed.2d 265 (1982); *Fuentes v. Shevin*, 407 U.S. 67, 96, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972). Maybe the parallel argument that a liquor licensee's rights are merely conditional on the voters' not voting the precinct dry also fails. But this we need not decide, for even if there was a deprivation of property here, there was no denial of due process.

This may seem a startling conclusion. To make rights depend on the outcome of a popular election may seem the very opposite of due process of law. The Constitution would not have empowered judges insulated from the electoral process to protect the members of electoral minorities from certain consequences of majority rule unless the framers had to some extent distrusted popular elections. The Constitution's provisions for the indirect election of the President and (until the Seventeenth Amendment was adopted) the Senate as well are further evidence of this distrust. If there is cause to distrust majority rule even when mediated through legislative representatives, who exercise some independent judgment and are not merely transmission belts for their constituents' desires, there is greater cause to distrust lawmaking by referendum. Voters, even more obviously than legislators, are not judges, are guided by no standards, do not give reasons for their decisions, and are not subject to judicial review. To entrust rights to their discretion may therefore seem to eliminate the due process clause as a bulwark against the tyranny of majorities.

■ But to equate due process of law with a particular type of procedure, the adversary hearing modeled on the Anglo-American trial, and thus to create an unbridgeable chasm between democracy and due process, would take too narrow a view of due process. See *City of Eastlake v. Forest City Enterprises, Inc.*, 427 U.S. 668, 678–79, 96 S.Ct. 2358, 2364–65, 49 L.Ed.2d 132 (1976). Whatever the original meaning of the term, a question on which much ink has been spilled, it has come to stand (quite independently of the concept of "substantive due process") for a general requirement of "a fair process of decision-making ...." *Fuentes v. Shevin, supra*, 407 U.S. at 80, 92 S.Ct. at 1994; see also *Owen v. Lash*, 682 F.2d 648, 652 (7th Cir. 1982). That is not the same thing as a uniform code of procedure. "The Fifth Amendment guarantees no particular form of procedure; it protects substantial rights." *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 351, 58 S.Ct. 904, 913, 82 L.Ed. 1381 (1938); see also *FCC v. WJR, The Goodwill Station, Inc.*, 337 U.S. 265, 275 and n. 9, 69 S.Ct. 1097, 1103 and n. 9, 93 L.Ed. 1353 (1949). Of course we must not lean too heavily on general language; none of the cases from which we have just quoted dealt with the

popular referendum as a method of decision-making. In many settings, for example that of proceedings to revoke a television broadcast license because of the licensee's misconduct, a referendum would be a highly questionable method of decision-making, to say the least. But used to decide whether liquor may be sold in a particular area it is a pragmatic as well as venerable response to the social problems created by the sale and consumption of liquor. As the bitter experience of Prohibition should remind us, no national or even regional consensus has emerged with respect to the morality and consequences of alcoholic beverages. It has seemed best in default of consensus to leave the matter to local preference as expressed in the voting booth. Illinois' local-option liquor law is just section 2 of the Twenty-First Amendment writ small. It is not obvious to us that the question whether to forbid the sale of liquor in a particular precinct in Chicago would be decided more wisely, more speedily, or more cheaply by an administrative agency subject to judicial review than by the precinct's voters. The issue is well within a layman's competence and the small size of the precinct electorate should foster a sense of civic responsibility, each voter knowing that his vote could be decisive.

█ Whether a particular procedure for deciding a question is "fair" depends on the nature of the abuse that the procedure is designed to prevent. Usually it is designed to prevent a mistaken application of law. See, e.g., *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). That is not the problem here. The concern is not that the voters of a precinct might make a mistake in deciding to ban the retail sale of liquor; when they vote on the question they are voting their personal values and there is no criterion by which a court or other outsider could judge their decision correct or incorrect. The concern is that the voters might "gang up" to drive out of business a seller of liquor whom they disliked for reasons unrelated to any plausible public interest. This is a distinct type of arbitrary action that the

requirement of fair procedure is designed to prevent, or at least make less likely to occur. See Tribe, American Constitutional Law 503–04 (1978). It is therefore relevant to point out that the Illinois act does not permit the precinct's voters to single out a particular liquor seller to shut down. Compare *Larkin v. Grendel's Den, Inc.*, 454 U.S. 116, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982). The precinct can choose only between allowing and not allowing the retail sale of alcoholic beverages. See Ill. Rev.Stat.1981, ch. 43, ¶ 171. The voters must shut down all the retail liquor outlets in the precinct in order to shut down one and they must shut them down for four years because a new referendum cannot be held before that period has elapsed. *Id.*, ¶ 175. This means not only that the licensee who is disliked is protected to some extent by the licensee who is liked but also that the voters cannot impose costs on liquor sellers without imposing costs on themselves—the costs of not being able to buy liquor in the precinct.

█ The requirement that the precinct electorate act across the board shows that the judgment the voters are asked to make is legislative rather than adjudicative in character. (The Illinois courts have held that the local-option provision of the Liquor Control Act is not a delegation of legislative power, see, e.g., *Malito v. Marcin, supra*, 14 Ill.App.3d at 660, 303 N.E.2d at 264, and no doubt for many purposes it is not; but for the purpose of deciding whether the procedural safeguards of the adjudicative process are required, it is.) And notice and opportunity for a hearing are not constitutionally required safeguards of legislative action. *Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915); *Association of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1165–66 (D.C. Cir.1979). The fact that a statute (or statute-like regulation) applies across the board provides a substitute safeguard. See *United States v. Florida East Coast Ry.*, 410 U.S. 224, 245–46, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). This safeguard is built

into Illinois' local-option provision, and supplies a practical reason for classifying the referendum procedure as legislative for purposes of this case. And although the appellants did not have notice or an opportunity for a hearing in the sense familiar in adjudicative proceedings, they of course had ample notice of the forthcoming election and an opportunity to campaign against the proposition that the precinct should vote itself dry.

We do not submit gracefully to the tyranny of labels, and therefore do not hold that there is never any requirement of due process in the legislative process, cf. *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978) (dictum), beyond what is implicit in the observation that the across-the-board character of legislation provides some protection against the use of the legislative process to single people out for adverse governmental action. See generally Linde, *Due Process of Lawmaking*, 55 Neb.L.Rev. 197, 238–51 (1976). More may be required especially in a case like this where the legislation affects only a tiny class of people—maybe a class with only one member. This is the concern that lies behind the prohibition (applicable to both the federal government and the states, see U.S. Const. art. I, §§ 9, 10) of the bill of attainder, "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977). Of course the fact that the Constitution explicitly prohibits both bills of attainder and (in the same clauses) ex post facto laws, when combined with the extensive substantive limitations that the Constitution imposes on legislation (notably in the equal protection clause of the Fourteenth Amendment), could be used to support an argument that the courts have no authority to impose any other procedural requirements on the legislative process. But we are reluctant to go so far, at least in a case where the legislative process is as particularistic as it is here. There are al-

most 3,000 precincts in Chicago, each having between 350 and 850 registered voters. Most of the precincts are very small, and more than 20 consist of a single high-rise building. No doubt many precincts contain only one liquor store or bar. And because the precincts are so small, the inconvenience that the voters must visit on themselves to ban a particular vendor will often be slight. If the registered voters living in a precinct consisting of a single high-rise building decided to shut down a bar in the building not because they did not approve of liquor or of its being sold in their building but because they did not like the bar's owner, they could vote the precinct dry with little inconvenience to themselves; some of the surrounding precincts would be bound to be wet. And yet the fact that even slight inconvenience is a price that the voters must pay to get rid of a bar or a liquor store (unless a majority of the voters are teetotalers) makes this a more than usually responsible electoral process, for there is no general requirement that a legislative or popular majority place any burden on itself as a condition of being allowed to place a burden on others.

We conclude that although the small size of the Chicago precincts creates an opportunity for abuse, the danger is not so great as to make the local-option feature of Illinois' law unconstitutional. Cf. *City of Eastlake v. Forest City Enterprises, Inc., supra*, 426 U.S. at 679, 96 S.Ct. 2365. If as we believe the basic principle of such laws is constitutional, that must be the end of the judicial inquiry. To redraw the precinct map of Chicago—or force the city or the state to do so—merely to assure that every precinct is large enough to make the voters in it think twice before voting the precinct dry would be a remedy disproportionate to the evil sought to be prevented. Although the Twenty-First Amendment did not repeal the Fourteenth Amendment, *Wisconsin v. Constantineau*, 400 U.S. 433, 436, 91 S.Ct. 507, 509, 27 L.Ed.2d 515 (1971); *California v. La Rue*, 409 U.S. 109, 115, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972), it provides additional support for upholding a state's local-option liquor law.

In holding that the referendum is a constitutionally permissible method of regulating the local sale of liquor, we assume that the referendum is conducted fairly and honestly. Although the plaintiffs question the adequacy of the statutory procedures for challenging fraud in the conduct of local-option referenda, we do not find any allegation of fraud in the complaint. The allegation was made for the first time in the petition for rehearing, and comes too late.

AFFIRMED.

HARLINGTON WOOD, Jr., Circuit Judge, concurring.

I join the result reached by the majority, but I believe there is a little more direct route to that result. I consider it unnecessary to reach and decide the question of whether in this situation the process that is due under the fourteenth amendment may consist of a popular election.

Appellants argue that the local option provision is an unconstitutional delegation of legislative authority to the voters, violating due process by depriving appellants of liquor licenses without notice or a hearing. District Judge Kocoras' analysis delivered from the bench provided an adequate and appropriate ground upon which to uphold the local option provision against due process challenge.

Appellants concede, as they must, that the Illinois General Assembly is empowered to prohibit or regulate the sale of alcoholic beverages in the state. The Liquor Control Act clearly reflects a legislative determination to discourage the use of alcohol through close regulation. The General Assembly, by enacting the local option provision, acted upon this determination to pass a valid prohibition on the sale of alcoholic beverages. The legislature, however, chose to suspend imposition of this prohibition pending the choice of local voters to make it operative in their village or precinct.

The legislature could have enacted a prohibition of alcoholic beverages effective without further action, and thus was within its authority to enact a prohibition effective only upon a local referendum. *See Rippey v. Texas,* 193 U.S. 504, 509–10, 24 S.Ct. 516, 517, 48 L.Ed. 767 (1904). While Justice Holmes' assertion in *Rippey,* that the power to prohibit includes the power to prohibit conditionally, has proven overbroad in other contexts, the holding of the case remains in force in the context of a local option provision of an otherwise constitutional legislative enactment such as a prohibition on the sale of liquor under the unique aegis of the twenty-first amendment.

The local option referendum gives local voters no discretion other than the choice to put the legislative enactment and its underlying policy determination into effect in their community. *Cf. Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982) (standardless discretion given nearby churches to disapprove liquor licenses reflected entanglement in violation of Establishment Clause); *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 121–22, 49 S.Ct. 50, 51–52, 73 L.Ed. 210 (1928) (due process violation where legislature suggested approval of land use but left zoning decision to neighboring landowners). Illinois courts upholding the local option law against due process challenge have held that the legislative power indeed remained in the legislature. *See, e.g., Malito v. Marcin,* 14 Ill.App.3d 658, 660, 303 N.E.2d 262, 264 (1973), *appeal denied,* 55 Ill.2d 602, *appeal dismissed for lack of a substantial federal question,* 417 U.S. 963, 94 S.Ct. 3165, 41 L.Ed.2d 1135 (1974) (while the legislature may not delegate its function to private persons, it may enact a law which will become operative upon the affirmative vote of the people affected, provided the law contains an "entire and perfect declaration of the legislative will"); *see also Hoogasian v. Regional Transportation Authority,* 58 Ill.2d 117, 128–29, 317 N.E.2d 534, 540–41, *appeal dismissed for lack of a substantial federal question,* 419 U.S. 988, 95 S.Ct. 298, 42 L.Ed.2d 261 (1974) (upholding against due process challenge the statutory creation of regional transportation authority upon voter approval by referendum).

We thus are left with a due process challenge to the legislative action itself. Legislative actions which are of general applicability are not subject to a due process requirement that affected persons be given notice and an opportunity to be heard; the process due is found in the electorate's power over its chosen representatives. *See Bi-Metallic Investment Co. v. State Board of Equalization of Colorado*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915); *see also Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1166 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

The venerable local option law is not an unconstitutional delegation of legislative authority in violation of the due process clause, but a complete legislative enactment which goes into effect contingent upon a future event. Appellants may seek relief from the local option law through legislative revision, a challenge of the procedures used in a particular referendum, or by launching a local campaign to pass a new referendum.